**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 2 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JAMES FREDERICK ROWLAND,

Defendant-Appellant.

No. 96-1512
No. 97-1016

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 96-CR-100-N)

---

Arthur S. Nieto, Denver, Colorado, for Appellant.

Mark J. Barrett, Assistant United States Attorney, Denver, Colorado (Henry L. Solano, United States Attorney, Charlotte J. Mapes, Assistant United States Attorney, Denver, Colorado, on the brief), for Appellee.

---

Before **TACHA, McKAY,** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

James Rowland appeals the district court's denial of his motion to suppress evidence obtained from his residence pursuant to an anticipatory search warrant. Rowland argues the warrant was invalid for lack of probable cause because the supporting affidavit failed to establish a sufficient nexus between the items to be seized and Rowland's residence. Although we conclude the warrant was not supported by probable cause, we affirm the district court's denial of the motion to suppress based on the good-faith exception to the exclusionary rule.

## BACKGROUND

In 1993, United States Postal Inspector Patrick Carr learned that Rowland had filled out and mailed a questionnaire distributed by a sexually oriented business, expressing an interest in child pornography. In this questionnaire, Rowland gave his name and the address of a private post office box and indicated that he was interested in incest, pedophilia, and transvestites. About three years later, Carr targeted Rowland in a child pornography sting operation. On February 5, 1996, Carr mailed to Rowland's private post office box a brochure which had a picture of a young girl on a bicycle and which stated: "New in Colorado!! Not your typical fantasy!!! Forbidden Lifestyles!!!" The brochure provided a telephone number and an e-mail address. Within a few days, Rowland called the telephone number and left a message indicating an interest in young girls, video

tapes, magazines, and "possibly meetings." Rowland gave the telephone number of a public pay phone and left the address of his private post office box.

On February 13, in response to the telephone message, Inspector Carr sent a second solicitation letter to Rowland. This letter thanked him for calling the "Family Affairs Hotline." The letter contained descriptions and prices of nine sexually explicit video tapes, referred to the availability of "a wide variety of both foreign and domestic magazines," and provided an order form. The following day, Rowland mailed an order for two video tapes, along with a money order for $125. Rowland also requested information about the magazines.

After receiving this order, government agents conducted surveillance of Rowland's post office box to determine his identity and to determine where he went after collecting his mail. The agents obtained a description of Rowland, learned that he worked for the Colorado Department of Revenue, and determined his home address. The agents also learned that the private post office box had been rented by someone other than Rowland, but Rowland was authorized to receive mail there.

On March 7, 1996, the government applied for and a magistrate judge issued an order for the installation of a mobile tracking device ("beeper") in a package containing the two ordered video tapes to be delivered to Rowland's private post office box. The government also obtained an anticipatory warrant to

search Rowland's residence. The search warrant allowed investigators to search Rowland's residence once the package containing the video tapes was brought into the residence.

On March 8, the government delivered a package containing the two ordered video tapes and the beeper to Rowland's private post office box. At about 10:30 a.m., government agents observed Rowland pick up the package and walk back to his place of employment. While Rowland was walking back to work with the package, the beeper went into alarm mode, indicating that the package had been opened. The agents maintained surveillance outside Rowland's place of employment for the remainder of the day. Rowland was observed leaving his work at lunch time, but the beeper indicated that the package remained in the building.

Before Rowland left work at about 4:30 p.m., the beeper stopped functioning because the batteries had been exhausted. Government agents observed Rowland leave the building and walk to his car carrying a backpack and plastic bag, but they could not determine visually or by radio signal whether Rowland had the video tapes. The agents followed Rowland as he then drove for about six blocks, turned around, went back to his work, parked his car, and entered the building for a minute or two. He then returned to his car and the agents followed as he drove straight home.

Once Rowland was home, government agents observed him enter his residence, but they were still unable to determine whether he had the video tapes. Accompanied by three or four police officers, Inspector Carr then approached Rowland's residence and knocked on the door. Rowland's wife answered the door. Carr identified himself and said he wanted to speak to Rowland. Rowland's wife invited them in. Rowland then appeared and Carr questioned him about the package he had received in the mail. Rowland at first stated he didn't know what Carr was talking about. Carr told Rowland he had been observed picking up the package and taking it to his place of employment. Rowland responded that the package was at work. Carr then asked him where the contents of the package were. Rowland pointed to a backpack about four or five feet away and said the video tapes were in the backpack. Carr then showed Rowland the search warrant and notified him that the officers were going to search his residence. In the course of the search, the video tapes were found in the backpack. In accordance with the warrant, the officers also seized other items during the search of Rowland's home, including sexually oriented magazines and books.

Rowland was charged with knowingly receiving in the U.S. mail a package containing video tapes with visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). Rowland subsequently

filed a motion to suppress the evidence seized at his home pursuant to the anticipatory search warrant. After a hearing on the motion to suppress, the district court denied Rowland's motion, determining that the warrant was supported by probable cause and that the police had satisfied the warrant conditions in executing the warrant. Alternatively, the district court determined that even if the warrant was invalid, the evidence need not be suppressed because the *Leon* good-faith exception applied to the search.

Rowland then entered a conditional guilty plea to the charge of receiving child pornography, reserving the right to appeal the district court's denial of his motion to suppress. *See* Fed. R. Crim. P. 11(a)(2). Rowland was sentenced to fifteen months imprisonment, followed by three years of supervised release.

On appeal, Rowland argues the district court erred in failing to suppress the evidence obtained from his home pursuant to the anticipatory search warrant. Rowland specifically asserts the anticipatory warrant was defective for lack of probable cause to believe the contraband would be found in Rowland's home.[1] Alternatively, Rowland asserts that, assuming the warrant was valid when issued,

---

[1]Rowland originally argued on appeal that anticipatory warrants are *per se* unconstitutional. After the filing of Rowland's initial brief, however, this court issued *United States v. Hugoboom*, 112 F.3d 1081 (10th Cir. 1997), in which the court held that anticipatory warrants are not *per se* unconstitutional. *See id.* at 1085-86. Rowland accordingly abandoned this argument in his reply brief and we do not address the argument in this opinion.

"the warrant's efficacy dissipated" when the beeper failed. Rowland also argues the *Leon* good-faith exception does not apply and therefore suppression of the evidence obtained pursuant to the invalid search warrant is appropriate.

This court exercises jurisdiction pursuant to 28 U.S.C. § 1291. In reviewing the district court's denial of Rowland's motion to suppress, we accept the district court's factual findings unless clearly erroneous and view the evidence adduced at the suppression hearing in the light most favorable to the government. *See United States v. Botero-Ospina*, 71 F.3d 783, 785 (10th Cir. 1995). The ultimate determination of the reasonableness of the search and seizure under the Fourth Amendment, however, is a question of law which we review *de novo*. *See id.*

**ANALYSIS**

**I. ANTICIPATORY WARRANTS**

This court first considered the constitutionality of anticipatory warrants in *United States v. Hugoboom*, 112 F.3d 1081 (10th Cir. 1997). In *Hugoboom*, the court joined the majority of other circuits in holding that anticipatory search warrants, or warrants "which only become[] effective upon the happening of a future event, [are] not unconstitutional *per se*." *Id.* at 1085; *see also United States v. Ricciardelli*, 998 F.2d 8, 11 (1st Cir. 1993) (reviewing general approval of anticipatory warrants by federal circuits). The court further recognized that

-7-

anticipatory warrants are not "'somehow suspect or legally disfavored,'" but have instead "repeatedly been upheld, assuming probable cause and so long as the conditions precedent to execution are clearly set forth in the warrant or in the affidavit in support of the anticipatory warrant." *Hugoboom*, 112 F.3d at 1085 (quoting *United States v. Gendron*, 18 F.3d 955, 965 (1st Cir. 1994)).

In determining that anticipatory warrants are not *per se* unconstitutional, the court noted that the United States Constitution only requires that "'a search . . . not be "unreasonable," and that warrants . . . be supported by "probable cause."'" *Id.* (quoting *Gendron*, 18 F.3d at 965 (quoting U.S. Const. amend. IV)). The court recognized that

> "[t]here is nothing unreasonable about authorizing a search for tomorrow, not today, when reliable information indicates that [the contraband] will reach the house, not now, but then. Nor does it seem automatically unreasonable to tie the warrant's search authority to the future event that brings with it the probable cause . . . . In principle, the use of a 'triggering event' can help assure that the search takes place *only* when justified by 'probable cause.'"

*Id.* (quoting *Gendron*, 18 F.3d at 965) (citation omitted).

As the court indicated in *Hugoboom*, the two general requirements for a valid anticipatory warrant are (1) that it be supported by probable cause and (2) that the warrant or supporting affidavit clearly set out conditions precedent to the warrant's execution. *See id.*

## A. Probable Cause

Anticipatory warrants differ from traditional search warrants in that at the time of issuance they are not supported by probable cause to believe that contraband is currently located at the place to be searched. *See United States v. Dennis*, 115 F.3d 524, 528 (7th Cir. 1997). "In fact, a court issues an anticipatory warrant with the knowledge that the contraband does not presently exist at the location to be searched." *Id.* This does not mean, however, that anticipatory warrants need not be supported by probable cause. Instead, before issuing an anticipatory warrant the magistrate must determine, based on the information presented in the warrant application, that there is probable cause to believe the items to be seized will be at the designated place when the search is to take place. *See United States v. Garcia*, 882 F.2d 699, 702 (2d Cir. 1989) ("[T]he fact that the contraband is not 'presently located at the place described in the warrant' is immaterial, so long as 'there is probable cause to believe that it will be there when the search warrant is executed.'" (quoting *United States v. Lowe*, 575 F.2d 1193, 1194 (6th Cir. 1978))).

Probable cause for anticipatory warrants is contingent on the occurrence of certain expected or "triggering" events, typically the future delivery, sale, or purchase of contraband. Therefore, in making the probable cause determination, the magistrate must "take into account the likelihood that the triggering event[s]

will occur on schedule and as predicted." *Ricciardelli*, 998 F.2d at 11. If the triggering events do not occur, the anticipatory warrant is void. *See Garcia*, 882 F.2d at 702 ("An anticipatory warrant, by definition, is a warrant that has been issued before the necessary events have occurred which will allow a constitutional search of the premises; if those events do not transpire, the warrant is void.").

In addition to taking into account the likelihood that the triggering events will occur, the magistrate must also determine the likelihood that, after the triggering events have occurred, the contraband will be at the designated place when searched. As with all warrants, probable cause to support an anticipatory warrant "does not exist unless a sufficient nexus between the [contraband] and the place to be searched exists." *Dennis*, 115 F.3d at 530.

## B. Conditions Precedent

Because the probable cause for an anticipatory warrant is contingent on the occurrence of anticipated events, the warrant or affidavit should express conditions permitting the search to be conducted only after the anticipated events have taken place.[2] *See id.* at 528 ("[A]t the time a court issues an anticipatory

---

[2]Although the preferred practice is for the anticipatory warrant to itself set out, or incorporate by reference, the conditions for the warrant's execution, this court has held that the failure to state the conditions in the warrant does not necessarily render the warrant invalid. *See Hugoboom*, 112 F.3d at 1087. As the court indicated in *Hugoboom*, there is no Fourth Amendment violation requiring suppression when the conditions for execution of the anticipatory warrant are "'stated in the affidavit that solicits the warrant, accepted by the issuing

warrant, probable cause exists to believe that contraband will be located at the premises to be searched after certain events transpire.  Thus, conditions precedent to the execution of an anticipatory warrant are integral to its validity." (citation omitted)).  This not only ensures against premature execution of the warrant, *see Garcia*, 882 F.2d at 703-04, but also maintains judicial control over the probable cause determination and over the circumstances of the warrant's execution, *see generally Ricciardelli*, 998 F.2d at 12 (stating that because warrants conditioned on future events present potential for abuse beyond that of traditional warrants, magistrates issuing such warrants must protect against opportunities for government agents to exercise unfettered discretion, in part by explicitly placing conditions on execution).  Consistent with these purposes, the conditions governing the warrant's execution should be "explicit, clear, and narrowly drawn so as to avoid misunderstanding or manipulation by government agents."  *Garcia*, 882 F.2d at 703-04; *accord Dennis*, 115 F.3d at 528; *Ricciardelli*, 998 F.2d at 12. The particularity with which the magistrate should specify the conditions, however, will vary based on the individual facts of each case.

Although the conditions precedent ensure that an anticipatory warrant will

---

magistrate, and actually satisfied in the execution of the warrant.'"  112 F.3d at 1087 (quoting *United States v. Moetamedi*, 46 F.3d 225, 229 (2d Cir. 1995).

not be executed prematurely, such conditions do not serve as a substitute for the magistrate's probable cause determination. *See United States v. Hendricks*, 743 F.2d 653, 654-56 (9th Cir. 1984) (holding anticipatory warrant for search of defendant's home was invalid because affidavit provided no assurance that defendant would take package to his home after collecting it at the airport, despite fact that warrant contained condition that it was not to be executed until package arrived at defendant's house). If an anticipatory warrant is based solely on speculation that contraband will be found at a given location at some time in the future, it lacks a probable cause foundation at the moment of its issuance and is therefore invalid regardless of the extent to which the warrant's provisions assure that no search will be commenced until probable cause exists. *See State v. Gutman*, 670 P.2d 1166, 1172 (Alaska Ct. App. 1983). The conditions precedent to execution of an anticipatory warrant are mere guarantees that the probable cause determination at the time of issuance has reached fruition when the warrant is executed.

In sum, the magistrate must not abdicate the judicial function of determining probable cause at the time the warrant is sought by relying on police assurances that the search warrant will not be executed unless probable cause exists. Instead, the magistrate must require a particularized showing, based on facts existing when the warrant is issued, that the items to be seized will be at the

designated location when the search takes place. *See Hendricks*, 743 F.2d at 655; *see generally State v. Wright*, 772 P.2d 250, 258-59 (Idaho Ct. App. 1989) (Burnett, J., concurring) (discussing risk of judicial abdication of probable cause determination as one of the possible dangers of anticipatory warrants); *State v. Lee*, 613 A.2d 395, 398-400 (Md. Ct. Spec. App. 1992) (same), *aff'd*, 624 A.2d 492 (Md. 1993).

C.  Anticipatory Warrants Based on Delivery of Contraband

As recognized in *Hugoboom*, when the warrant application indicates there will be a government-controlled delivery of contraband to the place to be searched, probable cause for a search is established and an anticipatory warrant may be issued, provided the warrant's execution is conditioned on the contraband's delivery to, or receipt at, the designated place. *See* 112 F.3d at 1086-87; *see also Garcia*, 882 F.2d at 702-03. In this context, the *Hugoboom* court indicated that when the warrant affidavit refers to a controlled delivery of contraband to the place designated for search, the nexus requirement of probable cause is satisfied and the affidavit need not provide additional independent evidence linking the place to be searched to criminal activity. *See* 112 F.3d at 1086.

When the delivery of contraband is not completely within the government's control, however, or when the delivery is to be made to a place other than the

-13-

premises designated for search, additional reliable information in the warrant application must indicate that the contraband will be at the designated premises at the time of the search. For example, when the delivery of contraband is not within the control of the government, the supporting affidavit should show not only that the agent applying for the warrant believes a delivery of contraband is going to occur, but also how the agent learned of the expected delivery, how reliable the information is, and what the role of law enforcement officers will be in the expected delivery. *See Garcia,* 882 F.2d at 703; *United States v. Leidner* , 99 F.3d 1423, 1426 (7th Cir. 1996); *see also* 2 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 3.7(c), at 366-67 (3d ed. 1996) (stating that to establish probable cause for anticipatory warrant, affidavit must "indicate how it is known that the items to be seized will on a later occasion be at the place specified" and stating that more details will be necessary in non-controlled delivery cases). Similarly, when a controlled delivery is not made to the place to be searched, such as when a defendant is required to pick up a package containing contraband at a post office, the warrant application must present additional facts establishing the contraband will be taken to the place designated for search. *Cf. Hendricks*, 743 F.2d at 654-55 (holding anticipatory warrant for search of defendant's home was invalid when defendant was required

to pick up suitcase containing contraband at airport and there was no assurance at time warrant was issued that defendant would take suitcase to his home).

## II. VALIDITY OF ANTICIPATORY WARRANT TO
## SEARCH ROWLAND'S RESIDENCE

Rowland argues the anticipatory warrant in this case was invalid for lack of probable cause because the supporting affidavit failed to establish a nexus between Rowland's residence and the contraband or any suspected criminal activity. Rowland asserts that although his private post office box had been linked to suspected criminal activity, the warrant affidavit failed to establish any link between such activity and his home.

"Probable cause undoubtedly requires a nexus between [the contraband to be seized or] suspected criminal activity and the place to be searched."[3]  *United*

---

[3]Some courts have held that to satisfy the nexus requirement of probable cause in the anticipatory warrant context, the warrant application must demonstrate the contraband is "on a sure and irreversible course to its destination" before a warrant may be issued. *United States v. Ricciardelli*, 998 F.2d 8, 12-13 (1st Cir. 1993); *see also United States v. Leidner*, 99 F.3d 1423, 1427-28 (7th Cir. 1996) (noting several circuits have adopted sure course requirement), *cert. denied*, 117 S. Ct. 1434 (1997); *United States v. Garcia*, 882 F.2d 699, 702-03 (2d Cir. 1989) (noting wide variety of courts have upheld anticipatory warrants when sure course requirement was met).  As one court has explained:

> The sure course standard functions as a proxy for the
> actual presence of the contraband at the locus to be
> searched.  It offers the magistrate a trustworthy
> assurance that the contraband, though not yet on the
> site, will almost certainly be located there at the time of the
> search, thus fulfilling the requirement of future probable

*States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990); *see also Dennis*, 115 F.3d at 530; 2 LaFave, *supra*, § 3.7(d). Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime. Instead, there must be additional evidence linking the person's home to the suspected criminal activity. *See Hendricks*, 743 F.2d at 655; *see also United States v. Lalor*, 996 F.2d 1578, 1582-83 (4th Cir. 1993) (stating "residential searches [are] upheld only where some information links the criminal activity to the defendant's residence").

---

cause. *Ricciardelli*, 998 F.2d at 13; *see also United States v. Hendricks*, 743 F.2d 653, 654-55 (9th Cir. 1984) (holding anticipatory warrant was invalid for lack of probable cause because, at time warrant was issued, the contraband was not on a sure course to the place to be searched and there was no assurance defendant would take contraband to that place).

The "sure course" requirement is typically satisfied in controlled delivery cases when the delivery is made directly to the place to be searched. Indeed, in *Hugoboom* , a controlled-delivery case in which the contraband was addressed to and sent directly to the defendant's residence, the court stated that the "sure course" standard was clearly satisfied by the facts of the case. *See* 112 F.3d at 1086-87. The court did not, however, expressly adopt the "sure course" requirement for the Tenth Circuit. *See id.*

It is unclear how, or whether, the heightened "sure course" requirement applies to anticipatory warrants outside the controlled delivery context. We recognize that the "sure course" standard is one way of satisfying the traditional nexus requirement of probable cause. In this case, however, because we conclude the warrant did not satisfy traditional probable cause requirements, *see infra* Part II, we need not further determine whether the more stringent "sure course" requirement is a necessary prerequisite to validity for all anticipatory warrants.

-16-

Under the probable cause analysis traditionally employed in non-anticipatory warrant cases, probable cause to issue a search warrant only exists when the supporting affidavit sets forth sufficient facts that would lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime. *See United States v. Burns*, 624 F.2d 95, 99 (10th Cir. 1980). In determining whether probable cause exists to issue a search warrant, a magistrate's task is to make a "practical, common-sense decision" based on the totality of the circumstances as set forth in the affidavit. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Corral-Corral*, 899 F.2d at 931. Reviewing courts should give the magistrate's ultimate probable cause decision "great deference." *United States v. Cusumano*, 83 F.3d 1247, 1250 (10th Cir.1996) (en banc) (citation omitted). Nevertheless, this court will not defer to the magistrate's determination if the affidavit does not provide "'a substantial basis for concluding that probable cause existed.'" *Id.* (quoting *Gates*, 462 U.S. at 238-39).

The affidavit in this case contained information supporting a probable cause determination that Rowland was involved in criminal activity and that the delivery to Rowland's private post office box would take place. The affidavit indicated that Rowland had ordered the video tapes and had requested that they be sent to him at his post office box. The affidavit further indicated that the agents

planned to make a controlled delivery of the video tapes to Rowland at the post office box and planned to maintain surveillance over the post office box to determine that Rowland picked up the package. The affidavit also indicated that Rowland had been observed on several occasions collecting his mail from the post office box and then walking back to work.

Because the controlled delivery was made to Rowland's private post office box and not to his residence, however, establishing probable cause that the delivery would take place does not mean there was probable cause that the video tapes would be at Rowland's residence when the search took place. Therefore, this court must determine whether the affidavit supporting the anticipatory warrant contained evidence establishing a nexus between the contraband and Rowland's residence. *See Hendricks*, 743 F.2d at 654-55 (holding anticipatory warrant for search of defendant's home was invalid because contraband was picked up by defendant rather than being delivered to his home and affidavit failed to provide facts establishing a nexus between contraband and defendant's home).

Only an oblique reference was made in the affidavit to the anticipated route of the contraband after its delivery to Rowland's post office box. The affidavit stated: "It is anticipated that [Rowland, after picking up the tapes from the post office box,] will go to his place of employment and after work to his residence."

The affidavit contained no information suggesting that Rowland had previously transported contraband from his private post office box to his home or that he had previously stored contraband at his home. Nor did the affidavit provide any facts linking Rowland's residence to suspected illegal activity, such as in the past having similar video tapes or other illegal materials delivered directly to his home.

The government nevertheless contends that the affidavit contained sufficient information for the magistrate to determine there was probable cause that Rowland would collect the package and then take it to his home after he left work. The government notes the affidavit contained information that Rowland's usual practice was to pick up his mail and then walk back to work, and the affidavit also indicated that Rowland was employed by the Colorado Department of Revenue. The government asserts that from this information, a "logical inference" was that Rowland would not store or view the illegal video tapes at work, but would instead take the video tapes to his home.[4]

---

[4]In holding that the warrant was supported by probable cause, the district court agreed with the government that it was "a reasonable inference . . . that given the previous activities that the officers had observed, one might expect that the video[s] would eventually make [their] way to the apartment to be searched and not stay permanently at the defendant's place of work." The district court further explained that the

> officers had observed the defendant pick up packages, go back to his office. They had also been where he resided. They could reasonably infer that the contents of

In making the probable cause determination, the issuing magistrate may draw reasonable inferences from the material provided in the warrant application. *See Gates*, 462 U.S. at 240; *cf. United States v. Lawson*, 999 F.2d 985, 987 (6th Cir. 1993) (stating that in determining whether there is probable cause to support a warrant, the issuing magistrate is "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense" (internal quotations omitted)). In this case, a magistrate could infer from the affidavit that Rowland would be unlikely to view or store the video tapes at his place of employment. A further possible inference was that, after removing the tapes from his workplace, Rowland would take the tapes home to view or store. Rowland's home, however, was but one of an otherwise unlimited possible sites for viewing or storage. The Carr affidavit provided no basis to either limit the possible sites or suggest that Rowland's home was more likely

---

> this particular package would not be readily usable at the defendant's office. And I do not find it to be an unreasonable inference to assume that the contents of the package would eventually make their way to the defendant's home where they could more likely be viewed than they could at the office.

Although, as the district court and government suggest, it was reasonable to infer that Rowland would not view or store the illegal video tapes at work, particularly given the fact that Rowland was a State employee, the district court did not address and the government has not explained why it was logical to infer Rowland would take the tapes home to view or store, rather than taking the tapes to some other location.

than the otherwise endless possibilities. As a consequence, the possible inference that Rowland would take the tapes home, in and of itself, is insufficient to provide a substantial basis for concluding there was probable cause to believe the contraband would be in Rowland's home at the time the search was to take place.[5]

Given the absence of any facts in the affidavit linking the contraband to Rowland's home, the magistrate had no information from which to determine, at the time he issued the warrant, there was probable cause to believe the contraband would be at Rowland's residence when the search was to take place.[6] *Cf.*

---

[5]In arguing the warrant was supported by probable cause, the government also asserts that a magistrate may consider an affiant's experience and expertise in making the probable cause determination, and notes the affidavit in this case described Inspector Carr's training and investigative experience in the area of child sexual exploitation and child pornography. The affidavit did not, however, set out any facts suggesting that, based on Carr's experience, there was reason to believe Rowland would be likely to view or store such materials at his home, rather than viewing or storing the materials at another location. Therefore, we reject this argument.

The government additionally asserts the warrant affidavit indicated Rowland had been "observed in his daily routine," which included picking up his mail, walking back to his office, and "driv[ing] to his residence after work." The affidavit, however, in fact only stated that Rowland had been observed picking up his mail and walking back to his place of employment, and later leaving work and walking to his car at a nearby parking lot. The affidavit did not indicate whether Rowland would typically drive directly home after work, nor did it indicate whether Rowland would typically take home any mail he had collected that day from his private post office box.

[6]The government also asserts that because Carr "made no attempt to execute the search warrant until [Rowland] first indicated to him that the videotapes were in his residence," Carr "[i]n effect . . . delayed the search until the . . . nexus requirement had been met." Although officers must comply with an anticipatory warrant's conditions for the warrant to be validly executed, such

*Hendricks*, 743 F.2d at 654-56 (holding anticipatory warrant for search of defendant's home was invalid when defendant was required to pick up suitcase containing contraband at airport and there was no information indicating defendant would take suitcase home or otherwise linking defendant's residence to illegal activity); *State v. Goble*, 945 P.2d 263, 268-69 (Wash. Ct. App. 1997) (holding anticipatory warrant for search of defendant's home was invalid because facts made known to magistrate did not establish, at time warrant was issued, the required nexus between the contraband to be seized, which was mailed to defendant's post office box, and defendant's home); *see also Lalor*, 996 F.2d at 1582-83 (holding, in non-anticipatory warrant context, search warrant for defendant's home was invalid based on failure of affidavit to establish nexus between drug activity and defendant's home). We therefore conclude the warrant was not supported by probable cause and was thus invalid.[7]

---

compliance does not satisfy the threshold requirement that, at the time of the warrant's issuance, the warrant must be supported by probable cause. As discussed above, by placing conditions on a warrant's execution, a magistrate can ensure that the warrant is not executed prematurely. Such conditions do not, however, themselves provide the magistrate with a basis for making the probable cause determination. *See Hendricks*, 743 F.2d at 654-56. The magistrate must ensure that the judicial function of determining the existence of probable cause is not improperly delegated to government agents by relying on police assurances that a search will not take place unless there is probable cause.

[7]Because we have concluded the affidavit failed to provide a substantial basis for the magistrate's probable cause determination, we need not consider whether, assuming probable cause had existed, the warrant conditions were adequate for a valid anticipatory warrant.

### III. *LEON* GOOD-FAITH EXCEPTION

Although the warrant was not supported by probable cause, the evidence seized at Rowland's residence pursuant to the warrant need not be suppressed if the good-faith exception to the exclusionary rule, set out in *United States v. Leon*, 468 U.S. 897 (1984), applies.[8] The applicability of the *Leon* good-faith exception is a question of law which this court reviews *de novo*. *See Corral-Corral*, 899 F.2d at 929.

In *Leon*, the Supreme Court modified the Fourth Amendment exclusionary rule by holding that evidence seized pursuant to a search warrant later found to be invalid need not be suppressed if the executing officers acted in objectively

---

[8]This court has recognized that a reviewing court may, in appropriate cases, turn directly to the good-faith issue without first considering the validity of the warrant under the Fourth Amendment. *See United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993); *accord United States v. Leon*, 468 U.S. 897, 924-25 (1984). When there are important Fourth Amendment questions at issue, however, and resolution of such questions is "necessary to guide future action by law enforcement officers and magistrates," it is appropriate to first address the Fourth Amendment issues before turning to the good-faith issue. *Leon*, 468 U.S. at 925; *see also United States v. Dahlman*, 13 F.3d 1391, 1397 (10th Cir. 1993). In addition, resolution of the Fourth Amendment issue is often necessary, as in this case, to determine whether the officers' reliance on the warrant was reasonable for purposes of the good-faith analysis. *See Leon*, 468 U.S. at 925; *see also Dahlman*, 13 F.3d at 1397 (stating officers' reliance on warrant language found to be overbroad was "reasonable in part because this practice [of using certain boilerplate language in warrants] had not been ruled unconstitutional prior to today"). Based on these considerations, it was appropriate that this court first address the underlying validity of the warrant before considering the good-faith exception.

reasonable, good-faith reliance on the warrant. *See* 468 U.S. at 922. The *Leon* Court stated that the "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918. The Court explained that the exclusionary rule's purpose is "to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916. The Court further reasoned that police misconduct would not be deterred by excluding evidence seized by officers acting pursuant to a search warrant in the objectively reasonable belief that their conduct did not violate the Fourth Amendment. *See id.* at 918-21.

Although the Court indicated that evidence seized pursuant to a warrant should only be suppressed in unusual cases, the Court did recognize that there are circumstances in which an officer's reliance on a warrant could not be objectively reasonable and suppression is appropriate. *See id.* at 922-23. The Court described four such situations, two of which Rowland argues apply here. First, an officer's reliance is not objectively reasonable when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part)). Second, the good-faith exception will not apply and suppression is appropriate when the warrant is "so

facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.*

In determining whether the *Leon* good-faith exception should be applied, the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23. In making this determination, we consider "all of the circumstances," *id.,* and assume the executing officers have "a reasonable knowledge of what the law prohibits," *id.* at 919 n.20.

Rowland argues the good-faith exception does not apply in this case because the affidavit's failure to establish a sufficient nexus between the contraband and the location to be searched was a "readily observable," "non-technical defect [that] . . . should have been easily detected by an experienced postal inspector." We disagree. Although the affidavit did not establish a sufficient nexus between the contraband and Rowland's residence to provide probable cause to search, the warrant and supporting affidavit were not so facially deficient or so lacking in indicia of probable cause that the officers' reliance on the warrant in conducting the search was objectively unreasonable.

Despite the affidavit's failure to demonstrate a sufficient link between the contraband and Rowland's home for probable cause purposes, the affidavit as a

whole was not a bare bones affidavit, containing only conclusory statements and completely devoid of factual support. *See Leon*, 468 U.S. at 926; *United States v. McKneely*, 6 F.3d 1447, 4454 (10th Cir. 1993); *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985). As described above, the affidavit contained information detailing the investigation into Rowland's suspected criminal activity. The affidavit linked Rowland to the contraband and indicated Rowland was likely to pick up the video tapes at his post office box and take them back to his workplace. The affidavit also provided information from which it could reasonably be inferred that Rowland would not leave the video tapes at work, but would take them elsewhere, possibly his home, to view or store.

The supporting affidavit also placed specific conditions on the execution of the warrant. The affidavit contained Inspector Carr's assurances that government agents would maintain surveillance over the package after it was delivered to Rowland's post office box and that the warrant would not be executed unless the contraband was brought into Rowland's home. The record establishes, as discussed in Part IV below, that the officers complied with the conditions in executing the warrant.

Finally, we note that at the time the warrant was issued and executed, this circuit had not yet ruled on the constitutionality of anticipatory warrants and had not set out conditions on the validity of such warrants. Given the unsettled state

of the law, it was not unreasonable for the officers to rely on the magistrate's authorization. *See Cardall*, 773 F.2d at 1133 (stating that in considering the *Leon* good-faith principles "it must . . . be remembered that the knowledge and understanding of law enforcement officers and their appreciation for constitutional intricacies are not to be judged by the standards applicable to lawyers"); *see also Leon*, 468 U.S. at 919 ("If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." (internal quotations omitted)).

Application of the good-faith exception in this case is also consistent with the exception's rationale. As the Court stated in *Leon*, the exclusionary rule should only be applied in those unusual cases when its purpose, to deter police misconduct, will be furthered. *See* 468 U.S. at 918. As indicated, the officers' reliance in this case on the magistrate's determination of probable cause was not objectively unreasonable, and there is no indication in the record that the officers were involved in any misconduct in executing the warrant. Penalizing the officers for a mistake not their own "cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon,* 468 U.S at 921. Consequently, the evidence seized at Rowland's home pursuant to the warrant need not be

suppressed.[9] *Cf. Hendricks*, 743 F.2d at 656 (upholding admission of evidence obtained in search under *Leon* good-faith exception, despite concluding anticipatory warrant was invalid for lack of probable cause because sufficient nexus between contraband and defendant's residence was not established).

## IV.  EXECUTION OF WARRANT

---

[9]Rowland also argues the affidavit was submitted to the magistrate without full disclosure of all the facts.  Specifically, he asserts "Inspector Carr knew that there were no pre-existing facts connecting criminal activity to Rowland's home" and yet "failed to so inform the magistrate."  He also asserts Carr "failed to inform the magistrate of the known risk that the beeper's batteries would fail."

Suppression of evidence is appropriate if "the officers were dishonest or reckless in preparing their affidavit" and the magistrate was misled by information in the affidavit.  *Leon*, 468 U.S. at 926, 923.  Here, the record does not indicate Inspector Carr was dishonest or reckless in preparing the affidavit for the warrant.  As discussed above, Carr's belief that the affidavit was sufficient to provide probable cause for issuance of a warrant to search Rowland's home was not objectively unreasonable.  There is no evidence indicating that Rowland was actually aware that the affidavit was insufficient to provide probable cause.  Likewise, there is no evidence that Carr knew the beeper would fail or could reasonably expect such a failure.  As the Government points out,

> it is unreasonable to expect Inspector Carr to have anticipated that: (1) the defendant would pick up his mail 15 minutes after the package had been delivered to his box in the morning; (2) the defendant would open the package immediately, thus triggering the alarm mode on the beeper [which mode requires more power and thus drains the batteries more quickly]; and (3) the beeper would stop functioning before the defendant left for his residence after work.  A more logical assumption was that the defendant would pick up his mail during his lunch break, thus allowing the beeper enough time to continue functioning until the defendant got off work and proceeded to his residence.

We therefore reject Rowland's argument.

Rowland also argues the agents could not reasonably rely on the warrant in conducting the search because they failed to satisfy the warrant's conditions. Rowland first asserts that the warrant's execution was conditioned on the beeper continuing to function until the contraband arrived at Rowland's residence. Therefore, Rowland suggests that when the beeper failed, the officers could not properly execute the warrant.[10]

We disagree. The warrant was not expressly conditioned on the continued functioning of the beeper. Instead, the supporting affidavit stated that the "package [containing the video tapes] will be kept under surveillance by [Carr] and/or other law enforcement officers until it is received at [Rowland's] residence" and that "[o]nce received by an individual at the residence described and only when brought into the residence, this search warrant will be executed."

---

[10]The *Leon* good-faith exception will not save an improperly executed warrant. *See United States v. Moland*, 996 F.2d 259, 261 (10th Cir. 1993). Instead, the good-faith analysis assumes "that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant." *Leon*, 468 U.S. at 918 n.19; *see also United States v. Medlin*, 798 F.2d 407, 410 (10th Cir. 1986) (noting that the exclusionary rule is aimed at deterring police misconduct and explaining that "[u]nlike cases in which the police properly executed an invalid warrant that they reasonably thought was valid, in cases of improper execution there is police conduct that must be deterred"). Therefore, only if the execution was in accordance with the terms of the warrant may the good-faith exception be applied. *See Moland*, 996 F.2d at 261.

We note that in determining whether the officers complied with the warrant conditions in executing the warrant, we do not make any determinations concerning the sufficiency of the conditions themselves.

The affidavit did not contain any reference to a beeper or to the specific means of maintaining surveillance.

Rowland was observed collecting the package containing the video tapes and taking the package back to his place of employment. The beeper indicated that he opened the package while walking back to work and further indicated that when Rowland later left work during the lunch hour, the package remained at his work. Although the beeper stopped functioning before Rowland finally left work, government agents continued to maintain surveillance over Rowland, following him from his work to his residence. The agents observed Rowland leaving work carrying a backpack and bag, both of which he took into his apartment. The agents reasonably believed Rowland was likely carrying the video tapes in the backpack or the bag, but they were unable to absolutely determine that Rowland carried the video tapes into his residence. Before executing the warrant, however, Inspector Carr was able to confirm, based on Rowland's admission, that the video tapes were in the backpack in Rowland's home. At the suppression hearing, Carr testified he did not indicate to Rowland that he had a search warrant until Rowland admitted the tapes were in his home. Carr also testified that his understanding of the warrant was that if he had not been able to confirm the video tapes were in the apartment, the warrant could not have been executed. Thus, the officers did satisfy the warrant conditions in executing the search warrant.

Rowland further argues, however, that his statement to Inspector Carr indicating the video tapes were in his home was not voluntarily made, and thus the statement could not be relied upon to satisfy the warrant condition. Rowland specifically asserts the statement was "involuntary in light of the invalid warrant, the intimidating atmosphere created by numerous armed police officers in his entry and Carr's questioning him there, and nowhere for Rowland to retreat." Whether Rowland's statement was involuntary is a question of law subject to *de novo* review, although we accept the district court's factual findings unless they are clearly erroneous. *See United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996).

"The [F]ifth [A]mendment's privilege against self-incrimination prohibits the admission of incriminating statements where governmental acts, threats or promises cause the defendant's will to become overborne," thus rendering the statements involuntary. *United States v. Matthews*, 942 F.2d 779, 782 (10th Cir. 1991). In determining whether the defendant's will was overborne, this court looks at the totality of the circumstances. *See id.*

At the suppression hearing, Inspector Carr testified that after observing Rowland enter his apartment, he and several officers knocked on Rowland's door and were invited in by Rowland's wife. Carr then asked Rowland about the package. Rowland at first denied knowing anything about the package. Carr

informed Rowland that he had been observed picking up the package and taking it to his place of employment. Rowland then stated that the package was at his workplace. Carr again asked Rowland where the contents of the package were. In response, Rowland admitted the video tapes were in the apartment. Carr then informed Rowland that he had a warrant to search Rowland's home.

The record establishes that Carr's entry into Rowland's residence was consensual. Carr did not rely on the warrant to gain entry into Rowland's home or to elicit inculpatory statements from Rowland, but only disclosed that he had a search warrant after Rowland stated the video tapes were in his home. Although Carr was accompanied by several officers, they remained behind Carr while he spoke with Rowland, and the record does not indicate that they exhibited any signs of force or intimidation. The record contains no evidence that Rowland was subjected to improper threats or promises. Rowland was not in police custody or placed under arrest at the time the inculpatory statement was made. Under these circumstances, Rowland's statement was voluntary.

## CONCLUSION

This court concludes the anticipatory warrant was invalid for lack of probable cause based on the affidavit's failure to establish a sufficient nexus between the contraband and the location to be searched. Nevertheless, the district court did not err in refusing to suppress evidence recovered in the search of

Rowland's home because the officers acted in objectively reasonable, good-faith reliance on the warrant and because the officers complied with the warrant conditions and properly executed the warrant. Therefore, under the good-faith exception to the exclusionary rule, suppression was not required. Accordingly, this court **AFFIRMS.**

No. 96-1512, UNITED STATES v. ROWLAND

McKAY, Circuit Judge, dissenting:

I agree fully with the majority opinion that no probable cause existed to believe that the video tapes would be located at the named place to be searched, i.e., Defendant's residence, when the magistrate issued the warrant for the search of the residence. The affidavit supporting the warrant provided insufficient facts to support a nexus between the contraband or illegal activity and the place to be searched. See United States v. Dennis, 115 F.3d 524, 529-30 (7th Cir. 1997); United States v. Ricciardelli, 998 F.2d 8, 11 (1st Cir. 1993); United States v. Hendricks, 743 F.2d 653, 654-55 (9th Cir. 1984), cert. denied, 470 U.S. 1006 (1985).

In this case, Postal Service Inspector Carr led the investigation of Defendant, the sting operation, and the execution of the warrant. Subsequent to correspondence with Defendant concerning the purchase of child pornography materials, Inspector Carr targeted Defendant for a sting operation whereby a package of child pornography video tapes would be delivered to Defendant's private post office box. In his understandable zeal, the Inspector, as procuring and executing officer, applied for and received a search warrant to search for the video tapes in Defendant's home. In every observation made and reported to the magistrate judge, Defendant would pick up his mail at the private mailbox and

take it to his place of employment.  Nothing that the Inspector knew or reported to the magistrate judge pointed to Defendant's residence.  Further, the Inspector did not report anything to the magistrate judge that would suggest that viewers of child pornography are more likely to view it at their homes.  What we know about people viewing pornography on their computers at work suggests a high probability that Defendant might observe pornography at work.[1]  See David Kane, High-Tech Measures Can Thwart Office Internet Misuse, DALLAS BUS. J., Jan. 24, 1997, available in 1997 WL 7887838 (discussing the problem of employees' frequent visits to pornography web sites).  As I have noted, nothing that the Inspector knew or reported to the magistrate judge created any nexus between the video tapes and Defendant's home.

To help cure this obvious deficiency of probable cause, the Inspector applied for and received an order authorizing the use of an electronic monitoring device [beeper] to track the package in the *hope* that Defendant would take the package to his home.  The Inspector reported to the magistrate judge that the beeper would permit him, accompanied by his team of law enforcement officers,

---

[1] I acknowledge that viewing pornography on the Internet is perhaps less intrusive and obvious than viewing a pornography video on a television screen. The two situations, however, are sufficiently analogous to point out that there is no more of a reasonable inference that Defendant would view the child pornography at home rather than at work.  The Inspector's failure to represent to the magistrate judge facts that might support an inference that Defendant would view the child pornography at home reinforces my conclusion.

to track the package. If the package were opened, an accelerated alarm would notify the officers.

The officers knew that the beeper stopped functioning at Defendant's place of employment before he left work for the day. When the beeper failed and the officers could not visually observe the package, no means represented to the magistrate judge could cure the failure to maintain surveillance over the package until it was received at Defendant's home. Despite the Inspector's full knowledge that he and his team had failed to keep the package under surveillance, a requirement that the magistrate judge's probable cause determination rested on, the Inspector was bent on executing the warrant as he saw fit. In applying Leon to these facts, the majority sanctions the following scenario: Officers approach a magistrate judge for a warrant to search a suspect's home for a package of contraband after a controlled delivery to a post office box. They declare that the suspect usually takes his mail from his post office box to his place of employment. But, the officers say, *if* they find evidence during the operation which shows that the suspect has this particular package in his home, they will execute the warrant. This scenario represents just the type of unchecked discretion that the Fourth Amendment was intended to prevent and destroys the notion that we analyze Fourth Amendment violations under a standard of objective reasonableness. Therefore, I must respectfully dissent from the

majority's conclusion that the good-faith exception set out in <u>United States v. Leon</u>, 468 U.S. 897, 922-24 (1984), applies in this case to prevent the suppression of evidence.

## I. Anticipatory Search Warrants

In all so-called "anticipatory search warrants," where the officers who procure and execute the warrant are part of a pre-arranged plan, sting, or controlled delivery, the magistrate judge's determination of probable cause hinges on the expected occurrence of some future event or condition which was represented to him. As the majority notes, <u>see</u> <u>ante</u>, at 9, the magistrate judge issuing an anticipatory search warrant must determine that probable cause will exist to believe, at some point in the future, that the items to be seized will be at the designated place to be searched when the search occurs. <u>See</u> <u>United States v. Garcia</u>, 882 F.2d 699, 702 (2d Cir. 1989), <u>cert. denied</u> <u>sub nom.</u> <u>Grant v. United States</u>, 493 U.S. 943 (1989); <u>State v. Smith</u>, 478 S.E.2d 237, 241 (N.C. Ct. App. 1996). Anticipatory search warrants are inherently problematic because, unlike other warrants, they depend for their validity on events which have yet to transpire and which are often uniquely in the control of the executing officers. <u>See</u> <u>Dennis</u>, 115 F.3d at 528; <u>United States v. Leidner</u>, 99 F.3d 1423, 1430-31 (7th Cir. 1996) (Wood, J., concurring), <u>cert. denied</u>, __ U.S. __ , 117 S. Ct. 1434

(1997); Ricciardelli, 998 F.2d at 20-21 (Torruella, J., concurring). Unlike normal warrants, an anticipatory warrant is not justified by past observations or events sufficient to establish probable cause but rather by conditions or events the executing officers have sworn they will either observe or cause to occur. See Dennis, 115 F.3d at 527 (controlled delivery); United States v. Hugoboom, 112 F.3d 1081, 1083-84 (10th Cir. 1997) (controlled delivery); Ricciardelli, 998 F.2d at 9-10, 16 (sting operation).

The purpose of the condition precedent is to ensure against premature or unlawful execution of the warrant by maintaining judicial control over the probable cause determination and over the circumstances of the warrant's execution. See Dennis, 115 F.3d at 528; Hugoboom, 112 F.3d at 1085-86; Ricciardelli, 998 F.2d at 12-13; Garcia, 882 F.2d at 703-04. When the condition precedent is not satisfied, the magistrate judge's probable cause determination is undermined and execution of the warrant is illegal. "If the party seeking the search . . . create[s] the circumstances which [provide] the probable cause, which then justify the warrant itself, the magistrate is removed . . . from his constitutionally mandated role." Smith, 478 S.E.2d at 241; see Hendricks, 743 F.2d at 654 n.1. This is exactly the course of events in this case.

The anticipatory warrant is based on facts which the procuring officer, the executing officer, and the issuing magistrate judge know full well have not yet

occurred. Thus any claim of good faith by the executing officers is inextricably bound up with their conduct after the warrant is issued. To compound this doubtful[2] notion of an anticipatory warrant by suggesting that the executing officer is acting in good faith when he or she executes the warrant knowing that the conditions failed, i.e., they did not occur as represented, is to totally ignore the magistrate judge's role of determining "probable" cause and to distort notions of good faith by authorizing the officer to substitute other facts for the ones the magistrate judge relied on. This case illustrates the cancerous role that these so-called "anticipatory search warrants" play in undermining the integrity of the judicial function in issuing warrants mandated by the Fourth Amendment.

## II. The Applicability of <u>Leon</u>

In <u>Leon</u>, the Supreme Court held that the exclusionary rule would not apply when an officer acted "in objectively reasonable reliance on a subsequently invalidated search warrant." 468 U.S. at 922. The Court emphasized that the exclusionary rule is aimed at deterring police rather than judicial misconduct, and the rule should be invoked only in cases in which it would deter police misconduct. See <u>id.</u> at 918-21. The applicability of <u>Leon</u> is a question of law

---

[2] The Supreme Court has never ratified anticipatory search warrants and has not addressed the <u>Leon</u> good-faith exception in this context.

-6-

which we review de novo. See United States v. Corral-Corral, 899 F.2d 927, 929 (10th Cir. 1990).

It is well settled in this circuit that the Leon good-faith exception does not apply to an improperly executed warrant. See United States v. Moland, 996 F.2d 259, 261 (10th Cir. 1993) (citing United States v. Medlin, 798 F.2d 407, 410 (10th Cir. 1986)), cert. denied, 510 U.S. 1057 (1994). "Unlike cases in which the police properly execute an invalid warrant that they reasonably thought was valid, in cases of improper execution there is police conduct that must be deterred." Medlin, 798 F.2d at 410. The question then is whether the execution in this case was in accordance with the terms of the warrant. See Moland, 996 F.2d at 261.

Because this warrant was an anticipatory one, my analysis differs slightly from other cases analyzing the execution of the warrant. I do not address the traditional questions relating to the execution of a warrant.[3] Instead, I am confronted with the essence of the dubiousness of anticipatory search warrants: The occurrence of future events or conditions which are often in the exclusive

---

[3] Generally, challenges to warrant execution ask whether the scope, intensity, and duration of the warrant execution were excessive; whether certain items not named in the warrant were properly seized; whether certain persons were properly detained or searched incident to execution of the warrant; whether the warrant was executed in an untimely fashion; or whether officers' entry without prior notice of authority and purpose was permissible. See Medlin, 798 F.2d at 410 (citing Wayne R. LaFave, "The Seductive Call of Expediency": United States v. Leon, It's Rationale and Ramifications, 1984 U. ILL. L. REV. 895, 915-16).

control of the executing officers and which are relied upon, but not observed, by the magistrate judge in his probable cause determination. The Inspector's fidelity in the execution of those future conditions is the only thing that even arguably can support the claim that this warrant was either validly issued or validly executed. I cannot see how the majority can conclude that "the officers complied with the conditions in executing the warrant," ante, at 26, when the essential sworn conditions failed. The execution of the warrant was invalid and prevents the application of Leon.

In analyzing the conditions to the warrant, courts read the descriptions in warrants and their supporting documents "in a 'commonsense' fashion." United States v. Gendron, 18 F.3d 955, 966 (1st Cir.) (quoting United States v. Ventresca, 380 U.S. 102, 109 (1965)), cert. denied, 513 U.S. 1051 (1994); see United States v. Bianco, 998 F.2d 1112, 1116-17 (2d Cir. 1993), cert. denied, 511 U.S. 1069 (1994); see also United States v. Tagbering, 985 F.2d 946, 950 (8th Cir. 1993) (construing warrant and supporting affidavit "fairly" and in "'commonsense'" manner) (citation omitted). Courts also recognize that the "conditions governing an anticipatory warrant [should be] 'explicit, clear, and narrowly drawn'" to preserve the magistrate judge's role in determining probable cause. Ricciardelli, 998 F.2d at 12 (quoting Garcia, 882 F.2d at 703-04); see Gendron, 18 F.3d at 965. The conditions in this case were stated in the affidavit

supporting the warrant. See Hugoboom, 112 F.3d at 1087 (holding valid conditions for execution of the warrant which are "constitutionally satisfactory," "stated in the affidavit that solicits the warrant," and "accepted by the issuing magistrate"). I therefore look at the context in which the warrant was issued to determine the nature of these conditions and whether they communicated a clear, simple directive to the executing officers. See Gendron, 18 F.3d at 966-67 (reviewing affidavit's description of where future triggering event would occur).

In this case, Inspector Carr's affidavit supporting the warrant stated two essential conditions which must occur before the anticipatory warrant is executed. The first condition required that the "package [would] be kept under surveillance by [Inspector Carr] and/or other law enforcement officers until it [was] received at the residence located" at the named address. Appellant's App. at 95. The second condition pledged that the search warrant would be executed only when the package was "received by an individual at the residence described and only when brought into the residence." Id. These two conditions are inextricably linked; both had to be satisfied for the warrant to be properly executed.

Several factors surrounding the procurement of the search warrant and the beeper order support the inescapable conclusion that the beeper surveillance was necessary to the proper execution of the warrant. The Inspector testified at the suppression hearing that his applications for the search warrant and beeper order

were presented and issued on the same day, see id. at 67, and the warrant and order indicate that they were both valid for the same duration. See id. at 78, 97. It is more than likely that the same magistrate judge issued both the order and the warrant. The reasonable inference is that both the Inspector and the magistrate judge knew that the beeper would be used to maintain surveillance of the package.

More importantly, in light of what was represented to the magistrate judge and the sting operation as implemented, see Gendron, 18 F.3d at 966-67, the only reasonable meaning of maintaining "surveillance" of the package, Appellant's App. at 95, is that the officers would, until the package was received at Defendant's residence, either maintain visual watch over the package or observe and ascertain the package's whereabouts by using the electronic monitoring device. See Bianco, 998 F.2d at 1117-24 (analyzing surveillance of oral communications by a roving electronic bug). Continuous surveillance was necessary to determine when the package was actually brought to the place to be searched, Defendant's residence. See Gendron, 18 F.3d at 967 (discussing importance of surveillance to execution of warrant). This common-sense interpretation is supported by the facts alleged in the warrant and beeper order affidavits. See id. at 966-67. The Inspector represented to the magistrate judge that he had visually observed Defendant on three prior occasions picking up his

mail and returning to his place of employment. The Inspector also pledged to the magistrate judge that the beeper was "required to ensure that the material in the package [was] not lost and to assist in identifying the perpetrator." Appellant's App. at 81-82.

It is irrelevant that the method of surveillance was not explicitly mentioned on the face of the warrant, or in its supporting affidavit, because the *only* means of maintaining surveillance of the package that were reasonably foreseeable to the magistrate judge when he issued the search warrant and the only means employed during the sting operation were through the use of the beeper or by visual observation. See id. at 46, 51. Although the officers could keep the package within their sight when Defendant carried the package from the post office box to his place of employment, it was impossible to maintain surveillance during the sting operation as executed without the benefit of the beeper once Defendant entered the building in which he worked. The beeper was, therefore, essential to the execution of the warrant because it provided the sole means of tracking the package after the officers lost sight of it. The officers obviously anticipated losing the ability to maintain visual surveillance over the package because they planned for that contingency as evidenced by their seeking an order authorizing the use of the beeper.

The necessity of the beeper to the proper execution of the warrant is

corroborated by the manner in which the sting operation occurred. Inspector Carr delivered the package with two video tapes and the hidden beeper to Defendant's private post office box. The Inspector and his team of law enforcement officers then watched the post office box from the moment the package was delivered until Defendant picked it up fifteen minutes later, at about 10:30 a.m. The officers followed Defendant by visual observation and by tracking the package with the beeper as he walked back to his place of employment. On his way back to work, Defendant opened the package which triggered the accelerated alarm in the beeper. See id. at 49. When Defendant left during lunch time, the beeper indicated that he had left the package in his place of employment.

We know from the Inspector's testimony at the suppression hearing that before Defendant left his place of employment for the day the beeper had stopped functioning because the batteries had died. See id. at 50. From that moment until Inspector Carr asked Defendant the location of the package, the officers had no idea where the package and its contents were. The condition that the "package [would] be kept under surveillance by [Inspector Carr] and/or other law enforcement officers *until* it [was] received at [Defendant's] residence" had irreparably failed.[4] See id. at 95 (emphasis added). Before the officers ever

---

[4] Because courts should interpret descriptions in warrants and their supporting documents in a "'commonsense' fashion," see Gendron, 18 F.3d at 966 (citation omitted), I need not decide whether a momentary lapse of surveillance

entered Defendant's home, they knew that they had not satisfied the surveillance condition represented to the magistrate judge, which was the only means by which the magistrate judge could determine that, at some point in the future, there would be probable cause to believe that the tapes would be transferred to Defendant's home. When Defendant left work at about 4:30 p.m., carrying a backpack and a white plastic grocery sack,[5] the officers saw neither the package which had previously contained the video tapes nor the tapes themselves. Although the officers could neither see nor electronically track the package, they followed Defendant to his residence. It is undisputed that the officers did not observe Defendant carrying the video tapes or package into his residence. They did not know whether he had the video tapes. In fact, the only thing the officers knew was that, just before the beeper failed, the probable location of the tapes was Defendant's place of employment, if indeed any probability existed in the affidavits reviewed by the magistrate judge.[6]

When the first condition, surveillance of the package, failed, the warrant

---

would mean the failure of the surveillance condition. In this case there was a significant period of time when the package was not under surveillance as promised to the magistrate judge.

[5] The record does not indicate whether Defendant had brought the backpack and white plastic sack to his place of employment earlier that day.

[6] I emphasize that nothing reported to the magistrate judge indicates that the Inspector observed Defendant going from his mailbox to his home or taking his mail to his home at the end of the day.

could no longer be validly executed. When the beeper died and the officers could no longer see the package, the magistrate judge's determination that probable cause would arise in the future, based upon the satisfaction of the conditions represented to him, was null and void. The officers' continued surveillance of the package until they determined that it was received at the place to be searched was a condition essential to the execution of the warrant. See Gendron, 18 F.3d at 967. This condition was unfulfilled, and the procuring and executing officers had full knowledge of this deficiency when they executed the warrant.

The majority's contention that the officers had satisfied the conditions of the warrant by entering Defendant's residence and asking whether the tapes were located in the residence ignores the fact that a condition represented to the magistrate judge and necessary to the warrant's proper execution had already been violated. The Inspector knew that the warrant had no vitality even before he went to Defendant's residence because the surveillance condition had not been met; nothing could breath life into the search warrant or revive the absence of probable cause to support that warrant. The only means of satisfying the first condition to the warrant had failed, and any new information obtained or observations made by the officers during the sting operation misappropriated the magistrate judge's probable cause determination. The majority's ratification of this improper execution of the warrant authorizes the transfer of the probable cause

determination to the executing officers based on information not represented to the magistrate judge. Inspector Carr proceeded with the absolute discretion that the Fourth Amendment and the magistrate judge's probable cause determination are intended to prevent. See Ricciardelli, 998 F.2d at 20-21 (Torruella, J., concurring). Because the execution was not in accordance with the conditions of the warrant, see Moland, 966 F.2d at 261, Leon should not be applied to prevent the suppression of illegally seized evidence.

### III. The Application of Leon

The more fundamental problem here lies in the inappropriate application of Leon's good-faith exception to this anticipatory search warrant. As stated above, the problem begins with an anticipatory search warrant in which the magistrate judge must rest his probable cause determination on the expectation that a condition or conditions in the control of the executing officer will be satisfied. The officer's sworn undertaking that he will only execute the warrant when he has caused or observed the essential conditions to occur totally vitiates any possibility that the execution is in good faith when the officer knows that the conditions did not occur. The majority's application of Leon to these facts compounds the constitutionally objectionable nature of these activities by sanctioning improper police conduct.

-15-

Under Leon, the proper test of an officer's good faith is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." 468 U.S. at 922 n.23. In determining whether an officer has acted in good faith in accordance with this objective test, a court should evaluate all attendant circumstances, see id., and assume that the executing officers have "a reasonable knowledge of what the law prohibits." Id. at 919 n.20. When "a government agent asserts good faith reliance on a magistrate's decision to issue a warrant, the court must focus upon the existence *vel non* of objective good faith at the time of the warrant application." Ricciardelli, 998 F.2d at 15-16 (citing Malley v. Briggs, 475 U.S. 335, 344-45 (1986)). This means that in this case, where Inspector Carr was both procuring and executing officer, the pre-planned scheme and the application for, the issuance of, and the execution of the search warrant are not a series of self-sustaining independent events but must be analyzed in context, examining the totality of the circumstances. See Leidner, 99 F.3d at 1424, 1429-30.

The Leon good-faith exception does not apply and suppression remains an appropriate remedy in four situations: (1) the magistrate judge issuing the warrant was misled by a deliberately or recklessly false affidavit; (2) the magistrate judge wholly abandoned his or her detached and neutral judicial role; (3) the warrant was based on an affidavit "so lacking in indicia of probable cause

as to render official belief in its existence entirely unreasonable," Brown v. Illinois, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part); or (4) the warrant was "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923 (citations omitted). In all of these circumstances, no reasonably well trained officer should rely on the warrant. Several of these limitations on the good-faith exception occurred in this case.

This is not the typical Leon situation where an officer who did not procure the warrant is told to go execute it. That officer is not charged with the antecedent knowledge resulting from the procurement of the warrant. Nor is this a situation where the magistrate judge merely misjudged probable cause and the executing officer is innocently unaware of that misjudgment. By definition, in this anticipatory search warrant case, everyone, including the procuring and executing officer and the magistrate judge, was fully and consciously aware that when the warrant was signed, probable cause did not exist. They all knew that the magistrate judge's probable cause determination was contingent upon the occurrence of future events, which were known by and in the control of Inspector Carr. The officers cannot reasonably and in good faith represent that they innocently relied on the magistrate judge's probable cause determination to believe that the tapes would be found in Defendant's residence when in fact they

-17-

knew only that the tapes had at one time been located at Defendant's place of employment and that the condition designed to ensure that the tapes would be found at Defendant's residence had failed. Because Inspector Carr was fully aware that the beeper had died and the conditions represented to the magistrate judge could not be met, any argument that he proceeded in good faith is absurd and incredible.

In applying for a search warrant, whether anticipatory or contemporaneous, every affiant-officer worth his or her salt knows that he or she must present facts or allegations which make a probable connection, a nexus, between the contraband or illegal activity and the place to be searched. This is not a new or unsettled complexity of the law peculiar to anticipatory search warrants. Probable cause for anticipatory warrants, like all search warrants, "undoubtably requires a nexus between [the contraband to be seized or] suspected criminal activity and the place to be searched." Corral-Corral, 899 F.2d at 937; see Illinois v. Gates, 462 U.S. 213, 238 (1983); Leidner, 99 F.3d at 1430-31 (Wood, J., concurring); Ricciardelli, 998 F.2d at 12-14. Defendant correctly argues that the good-faith exception does not apply because the affidavit's failure to establish a sufficient nexus between the contraband and the location to be searched was a "readily observable, . . . non-technical defect [that] . . . should have been easily detected by an experienced postal inspector." Appellant's Opening Br. at 12. Inspector

-18-

Carr not only should have easily detected the absence of a nexus during the execution of the warrant, but he knew, or should have known, that no such nexus existed when he applied for the search warrant.

Because Inspector Carr was the chief investigative officer or case agent, the procurer of the warrant, and the executing officer, he and his team of law enforcement officers are charged with the knowledge that he did not present facts or allegations to the magistrate judge showing a connection between the place to be searched and the package containing the video tapes. Inspector Carr's affidavit stated only that Defendant had been observed on three occasions picking up mail at a post office box in downtown Denver and walking back to his place of employment. The majority recognizes that the Inspector's affidavit only obliquely mentions Defendant's residence, stating that "it is anticipated that defendant, after picking up the tapes from the post office box, will go to his place of employment and after work to his residence." Appellant's App. at 95. Nothing in the affidavit traced any mail or package previously picked up by Defendant at the post office box to his residence. Nor did the affidavit show that Defendant stored other contraband in his home. Inspector Carr did not present facts, based on his experience or training, describing the nature of the crime or circumstances inherent in viewing pornography that link the crime or contraband to the suspect's residence. See United States v. Wylie, 919 F.2d 969, 975 (5th Cir. 1990);

Hendricks, 743 F.2d at 655.  In light of recent publicity concerning the fact that

employees are viewing Internet pornography at work on their company

computers,[7] there is nothing probable about the suggestion that this working man

would take child pornography to his home rather than his place of employment.

The Inspector's application for the beeper stated "that probable cause exists to

believe that the package containing the mobile tracking device will be picked up

at [Defendant's post office box] and transported to *other premises* for viewing

and use."  Appellant's App. at 83 (emphasis added).  He simply did not connect

the video tapes to the residence in any way.  Everything in the Inspector's

affidavit pointed to the fact that the package could be found at Defendant's place

of employment; nothing indicates that it could be at his residence.

The government's assertion that the affiant's experience and expertise was

relevant to the magistrate judge's probable cause determination also supports my

---

[7] With the advent of the "information superhighway," companies are faced with the dilemma created by Internet access for their employees:  Companies must balance the beneficial access to data with the detrimental and suspect access to pornography or other inappropriate personal uses.  The Wall Street Journal reported that employees of IBM, Apple Computer, and AT&T were among the most frequent visitors to Penthouse magazine's Web site, spending the equivalent of over 347 8-hour days in a single month.  See Kane, supra at 3; Suspended Principal Will Have Other Duties, WIS. ST. J., Oct. 2, 1997 (Local), available in 1997 WL 12263311; Wayne Tompkins, Caught on the Web More Companies Monitor On-the-Job Internet Abuse, FLA. TODAY, May 3, 1998 (Business), available in 1998 WL 11931216; Bruce Westfall, Clark College Fires Head of Security After Complaints, COLUMBIAN, Apr. 18, 1997, available in 1997 WL 6520467.

conclusion that Inspector Carr should be held accountable for his knowledge. See Appellee's Br. at 11. The Inspector testified that he had previously executed some ten to twenty anticipatory search warrants. See Appellant's App. at 59-60. The Inspector's expertise and experience in child pornography cases and in obtaining and executing search warrants in general shoulders him with the knowledge that a nexus is required between the place to be searched and the contraband. It is clearly and objectively *un*reasonable to suggest that an officer acted in good faith when he subjectively knew, or should have known, that he presented no facts or observations to the magistrate judge to support the requisite nexus. See Ricciardelli, 998 F.2d at 16; Smith, 478 S.E.2d at 244. This is exactly the type of misconduct that the exclusionary rule was intended to prevent.

Although the Inspector knew that surveillance over the package was essential to the proper execution of the warrant and was clearly aware that Defendant could pick up the package at any time, he did not present facts in the affidavit establishing the reliability of the beeper, how long the beeper was expected to function, or what time Defendant was likely to pick up the package. The majority points out that the record does not state that Inspector Carr intentionally misled the magistrate judge. No precise statement is necessary to show how Inspector Carr failed to disclose all relevant facts to the magistrate judge; the affidavits and the sting operation demonstrate this deficiency.

Contrary to the government's assertion and the majority's opinion, it is not more logical to infer that Defendant would pick up the package "during his lunch break, thus allowing the beeper enough time to continue functioning until [he] got off work and proceeded to his residence." Ante, at 28 n.9. The affidavit does not mention what time Defendant was previously observed picking up his mail and walking back to work. According to the record, the Inspector's team of law enforcement officers began visually observing the post office box *not* just prior to the lunch hour but as soon as the Inspector delivered the package to the mailbox in the morning. See Appellant's App. at 47-48. Therefore, not only is it entirely reasonable for the Inspector to anticipate that the package could be picked up at any time after delivery, but nothing in the record supports the notion that Defendant would pick up the package during his lunch break. It is also common sense to expect that someone might open a package when he receives it, thus triggering the beeper's accelerated alarm mode which would wear out the batteries more rapidly. The Inspector should have informed the magistrate judge of the likelihood that Defendant could pick up and open the package at any time, thereby triggering the accelerated alarm of the beeper which would make its batteries run out more quickly. Because the record reflects no evidence that the beeper malfunctioned in any way, Inspector Carr should have informed the magistrate judge of the possibility that the beeper could stop functioning before it

tracked the package to Defendant's home. These reasonable scenarios would affect the ability of the officers to maintain surveillance of the package, a condition necessary to the execution of the warrant. The Inspector may not proceed on "good faith" because his affidavit in support of the warrant was plainly submitted without full disclosure of all the relevant and reasonably foreseeable facts. See Leon, 468 U.S. at 923; Ricciardelli, 998 F.2d at 16-17.

The record reflects additional recklessness in the preparation of the search warrant affidavit. As previously discussed, Inspector Carr applied for the search warrant and the beeper order on the same day. Appellant's App. at 78-85. In reviewing the record, it becomes apparent that the affidavit in support of the beeper order is virtually identical to the search warrant application.[8] The only significant difference between the two affidavits is as follows: The warrant affidavit pledges that the package will be kept under surveillance and the warrant will not be executed until the package is "received by an individual at [Defendant's] residence" and "brought into the residence," id. at 95, while the

---

[8] The search warrant affidavit offers a professional description of the affiant and an explanation of the crime Mr. Rowland was suspected of violating. The electronic beeper affidavit states that the mobile tracking device will be attached to a package that is relevant to an ongoing criminal investigation to identify persons suspected of trafficking in materials containing sexual exploitation of children. Using identical language and organization, both affidavits then describe the background facts of the sting operation and Defendant's activities. See Appellant's App. at 79-82, 88-96.

beeper order affidavit states, more specifically, that "[the] device is required to ensure the material in the package is not lost and to assist in identifying the perpetrator." Id. at 81-82. Neither of the affidavits disclosed to the magistrate judge any facts showing the nexus between the video tapes and Defendant's residence. It is facially evident from this comparison that the affiant utilized one set of facts for both affidavits without providing the additional facts necessary to demonstrate to the magistrate judge that there is a fair probability that the video tapes would be found at Defendant's residence.[9]

Based on the foregoing analysis, I believe not only that the good-faith exception of Leon should not be applied to the improperly executed anticipatory search warrant but also that the officers in the case could not rely in good faith on the warrant and its supporting affidavit. Inspector Carr, admittedly a well-trained officer, knew or should have known that the search was illegal despite the magistrate judge's authorization. I therefore respectfully dissent and would order the evidence suppressed.

---

[9] I have considered the possibility that similar affidavits may be viewed as the methodology of an experienced, efficient law enforcement officer, and that the application for the beeper contained more than it needed to because it was really intended to satisfy the search warrant application. I have discounted this theory in light of the Inspector's failure to present facts to the magistrate judge supporting a nexus between the video tapes and Defendant's home. The Inspector, perhaps relying on his expertise and reputation, presented a sparse affidavit that could not objectively and reasonably be relied upon.