**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 24, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MATHIAS MORA,

    Defendant - Appellant.

No. 19-2097

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:16-CR-04358-MV-1)**
_____

Devon M. Fooks, Assistant Federal Public Defender, Office of the Federal Public Defender, Albuquerque, New Mexico, for Appellant.

Tiffany L. Walters, Assistant United States Attorney (John C. Anderson, United States Attorney, with her on the brief), Office of the United States Attorney, Albuquerque, New Mexico, for Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **CARSON**, Circuit Judges.
_____

**CARSON**, Circuit Judge.
_____

In our Republic, the Constitution imposes important limitations on the government to protect the rights of the governed. The Founders recognized that those limitations may, at times, hinder government efficiency. But they decided that

the incremental burden constitutional obligations place on the government's exercise of power is worth the benefit to individual liberty.

The Fourth Amendment generally requires the government to obtain a valid warrant to search a person's home. Although this obligation may hinder law enforcement efficiency, it protects the people from unreasonable intrusions. Indeed, the Fourth Amendment stems from the bedrock principle that intrusion into the home is "subversive of all the comforts of society." Berger v. New York, 388 U.S. 41, 49 (1967) (quoting Entick v. Carrington, 19 How. St. Tr. 1029, 1066 (C.P. 1765)). If courts stray from that long-standing principle, we forget "the very essence of constitutional liberty and security." Id.

Today we consider whether officers' search of Defendant Mathias Mora's home violated the Fourth Amendment. We hold that no exigent circumstances justified the officers' nonconsensual, warrantless search (protective sweep) of Defendant's home. We also hold that the excised search warrant affidavit failed to provide probable cause to search Defendant's home. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's suppression order.

I.

Officers responded to a 911 call reporting that dozens of people exited the back of a tractor trailer behind a supermarket. When officers arrived at the scene a few minutes later, the tractor trailer was gone. But officers found fourteen people lacking identification, some of whom admitted that a driver smuggled them across the border in

2

the back of a tractor trailer. None of the captured passengers suggested that the driver, or anyone else, took any passengers to another location.

Officers soon discovered a tractor trailer matching the 911 caller's description in a nearby Walmart parking lot. Officers opened the tractor trailer's rear doors to find it empty, except for a bottle apparently containing urine and the smell of body odor. Officers did not open the locked cab door.

Video footage revealed that the tractor trailer entered the Walmart parking lot about ten minutes after it left the supermarket, showing that the driver—Defendant— drove directly between the two stores. The tractor trailer did not move, nor did anyone besides Defendant exit the tractor trailer once it arrived at Walmart. After parking, Defendant entered Walmart, made purchases, and left in a different car driven by his wife.

Meanwhile, officers learned that the tractor trailer was registered to Defendant at a local address, which turned out to be Defendant's home. Officers proceeded to Defendant's home and beat him there. Soon after, Defendant arrived with his wife. Officers approached Defendant and recognized him from the Walmart video footage.

Next, officers placed Defendant and Mrs. Mora under arrest and searched them outside the home. During the search, officers seized keys and a cell phone from Defendant's pocket. Defendant admitted that he owned the tractor trailer and explained that he kept it at Walmart because he did not have a commercial yard for it.

Likewise, officers seized keys and a cell phone from Mrs. Mora. Responding to questions, she said that her son was inside the home, but nobody else was inside.

3

Officers then opened the home's unlocked front door and called for the son to come outside, which he did. Nobody else answered the officers' call. A few minutes later, officers questioned Mrs. Mora in the foyer of the home. She denied the officers permission to search the home and forbade them from going past the foyer. At that point, officers could see around the room, into the living room, the kitchen, and up the stairwell. Officers did not observe any signs of other people in the home.

Even so, officers conducted a warrantless search (protective sweep) of the home after consulting with the U.S. Attorney's Office "to ensure the safety of agents" and "the safety of other potential undocumented immigrants." Although they did not find any people, officers noticed what they believed to be a gun safe and ammunition containers. Officers also learned that Defendant was a felon, which would make him a prohibited possessor. Later that day, the government obtained a warrant to search Defendant's home for evidence of alien smuggling and prohibited possession of a firearm or ammunition. A subsequent search turned up both firearms and ammunition.

A grand jury indicted Defendant on charges of alien smuggling in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant filed a motion to suppress the fruits of the officers' warrantless search. The district court, however, denied Defendant's motion because the safety of potential aliens inside the home justified the search.

Defendant pleaded guilty to two counts of alien smuggling and one count of being a felon in possession of a firearm. The district court sentenced him to sixteen months' imprisonment for each alien smuggling count and forty-eight months' imprisonment for

the felon in possession count, all to run concurrently. Defendant now appeals the denial of his suppression motion, which relates only to his felon in possession conviction.

## II.

We accept the district court's factual findings unless clearly erroneous, but review de novo the district court's ultimate determination of reasonableness under the Fourth Amendment. United States v. Garcia-Zambrano, 530 F.3d 1249, 1254 (10th Cir. 2008).

## III.

We consider whether the district court erred by denying Defendant's motion to suppress the firearms and ammunition seized from his home. Defendant contends that officers unlawfully obtained firearms information during the warrantless search of his home. Defendant argues that we should excise the firearms information from the government's search warrant affidavit and that doing so renders the affidavit insufficient to establish probable cause to search his home. The government contends that even without the information obtained during the warrantless search, the affidavit established probable cause to believe officers would find evidence of alien smuggling in Defendant's home.

We begin our analysis by considering the validity of the search warrant affidavit and determine that we must excise the firearms information obtained during the officers' unlawful sweep of Defendant's home. We next consider whether the affidavit established probable cause to search Defendant's home without that information. We finally conclude that, without a valid warrant, the district court should have suppressed the fruits of the search under the exclusionary rule.

A.

The government contends that officers had reason to believe that aliens inside the home needed immediate aid, which justified the officers' warrantless search of Defendant's home. We disagree.

The Fourth Amendment generally requires a warrant for officers to search a person's home. Mincey v. Arizona, 437 U.S. 385, 393–94 (1978). An exception applies, however, when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Id. Specifically, "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person is in need of immediate aid." Id. at 392. But this exception "cannot be used merely to make law enforcement more efficient, to safeguard evidence that could be protected in another manner, or simply because a serious crime has been committed." United States v. Porter, 594 F.3d 1251, 1255 (10th Cir. 2010). So, if a search warrant affidavit contains information obtained through a prior, unlawful search, we must must excise that information and consider the adequacy of the affidavit anew. United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990).

Here, officers had no reason to believe that anyone was in the home when they entered without Defendant's permission or a warrant. Officers arrived at Defendant's home before Defendant and Mrs. Mora returned, so they had ample opportunity to observe the home and did not see any signs of danger. From the timeline of events,

6

officers knew that Defendant lacked a chance to return to the home and deposit aliens after he released them from his tractor trailer behind the supermarket. Mrs. Mora also told officers that nobody was in the home when they arrived except her son, who exited the home in compliance with an officer's command. Nobody else responded to the officers' calls, nor did officers hear any sounds from the home. In fact, officers questioned Mrs. Mora inside the foyer of the home, from which they could see several rooms before conducting their warrantless search. Again, no officer noticed any signs of other people from inside the home. Without evidence suggesting anyone was in the home, let alone in need of aid, officers fail to meet their burden of identifying exigent circumstances to justify their warrantless search of the home.[1]

Thus, we do not consider the firearms information gathered during the unlawful sweep in our subsequent probable cause analysis. Put differently, the excised affidavit does not establish probable cause to search the home for evidence of a felon in possession violation. So all that remains is the government's assertion that probable cause existed that officers would find evidence of alien smuggling in the home.

B.

We start our probable cause analysis, as we must, with the Fourth Amendment's text. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by

---

[1] Nor did the officers have a legitimate officer safety justification because they arrested Defendant outside the home and had no reason to enter the home in the first place.

requiring probable cause to support a search warrant. U.S. Const. amend. IV. (stating that "no Warrants shall issue, but upon probable cause"). "Probable cause to issue a search warrant exists only when the supporting affidavit sets forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Basham, 268 F.3d 1199, 1203 (10th Cir. 2001).

Although Supreme Court decisions have chipped away at the Fourth Amendment's warrant requirement,[2] the primary Tenth Circuit case upon which the government relies confirms that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. Biglow, 562 F.3d 1272, 1275 (10th Cir. 2009) (quoting United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972)); see also Segura v. United States, 468 U.S. 796, 810 (1984) (concluding that "the home is sacred in Fourth Amendment terms not primarily because of the occupants' possessory interests in the premises, but because of their privacy interests in the activities that take place within"). Allowing officers to search a home based solely on an affiant's experience and pure speculation would perpetuate that evil.

Indeed, "a nexus must exist between suspected criminal activity and the place to be searched." Biglow, 562 F.3d at 1278. And probable cause "to search a person's residence does not arise based solely upon probable cause that the person is guilty of a

---

[2] See, e.g., California v. Acevedo, 500 U.S. 565, 582 (1991) (Scalia, J., concurring) (lamenting that the Fourth Amendment's warrant requirement has "become so riddled with exceptions that it [is] basically unrecognizable").

crime." United States v. Rowland, 145 F.3d 1194, 1204 (10th Cir. 1998). Whether a nexus exists to search a suspect's home depends on the strength of the case-specific evidence that links suspected criminal activity and the home. Compare id. (holding that "additional evidence" must link a suspect's home to "the suspected criminal activity"), with United States v. Sanchez, 555 F.3d 910, 914 (10th Cir. 2009) (determining that probable cause a suspect was a drug supplier justified the search of his home because drug suppliers often keep contraband in their homes), and United States v. Reyes, 798 F.2d 380, 382 (10th Cir. 1986) (determining that evidence a suspect was a largescale drug trafficker established probable cause to search that suspect's home for drugs and related evidence that drug traffickers often keep in their home). Factors courts may consider in this analysis include: (1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence. Biglow, 562 F.3d at 1279.

We consider the type of crime at issue. Although the totality of the circumstances established probable cause that Defendant engaged in alien smuggling, the government failed to articulate how evidence of alien smuggling justified the search of his home. To be sure, we have upheld home searches involving largescale drug traffickers based on known practices of the drug trade, but those determinations also involved months-long investigations and corroborating evidence. Sanchez, 555 F.3d at 914 (corroborating suspicion about the location of drugs with an officer's observations of telephone conservations and a resident's presence at drug buys); Reyes, 798 F.2d at 382 (upholding

9

a probable cause determination based on the results of a five-month investigation).  And our precedent puts drug trafficking in a special class of crimes where we have "not required particular facts to support the inference that a drug trafficker keeps his supply at his residence."  Sanchez, 555 F.3d at 914 (observing that courts commonly hold "that this gap can be filled merely on the basis of the affiant-officer's experience that drug dealers ordinarily keep their supply, records and monetary profits at home" (quoting 2 Wayne R. LaFave, Search and Seizure § 3.7(d), at 421–22 (4th ed. 2004))).  Despite the government's reliance on drug trafficking cases, alien smuggling is not part of that special class where we have held that probable cause that a defendant committed the crime suggests the concealment of evidence in the home.  Thus, evidence that Defendant engaged in alien smuggling does not categorically or independently establish a nexus to his home under our precedents—as would evidence of drug trafficking.

Considering the nature of the evidence sought and Defendant's opportunity for concealment together, the government identifies a few general statements in the affidavit about commonly owned items.  The affiant stated, based on his training and experience, that alien smugglers often use electronic communication devices, GPS devices, and electronic banking systems to conduct operations and store records.  None of those boilerplate statements, however, are specific to Defendant's crime or circumstances.[3]  See

_____

[3] Statements identifying tools of the smuggling trade appear to be an afterthought when viewed in the context of the whole affidavit.  Those statements comprise one hand-written paragraph at the bottom of an otherwise typed, four-page document focusing on the officers' investigation and specific observations of Defendant.  See United States v. Weaver, 99 F.3d 1372, 1379 (6th Cir. 1996) (concluding that an affidavit did not support the issuance of search warrant for the

10

United States v. Zimmerman, 277 F.3d 426, 433 (3d Cir. 2002) (observing that "[r]ambling boilerplate recitations designed to meet all law enforcement needs do not produce probable cause" (internal quotation marks and citation omitted)).  The search warrant affidavit does not identify facts showing that Defendant possessed, let alone used, any of the supposedly suspicious items in connection with alien smuggling.  See United States v. Cordova, 792 F.3d 1220, 1225 (10th Cir. 2015), as corrected (July 31, 2015) (suppressing evidence obtained during a home search because, "without other information implicating [] [defendant] or his home in criminal activity, the officer's suggestion that [] [defendant] engaged in an activity sometimes associated with criminals is sheer speculation and of minuscule value"); Poolaw v. Marcantel, 565 F.3d 721, 732, n.10 (10th Cir. 2009), as amended (July 24, 2009) (rejecting a probable cause determination because of "the lack of specific information linking" what officers sought in the place to be searched despite general assertions based on officer experience; adding that "[f]or an officer's experience and training to support a finding of probable cause, the affidavit must set out *facts* explaining why, based on this experience and training, there was reason to believe the contraband is more likely to be found at the particular location" (emphasis added)).  Rather, the only object that the affidavit linked to Defendant's illegal

---

defendant's home because the affidavit's "combined boilerplate language and minimal handwritten information provide few, if any, *particularized facts* of an incriminating nature and little more than conclusory statements of affiant's belief that probable cause existed" (emphasis added)); see also United States v. Bosyk, 933 F.3d 319, 349 (4th Cir. 2019) (Wynn, J., dissenting) (opining that "when individualized information connecting an individual to a crime is absent, an affiant—much less a court—cannot rely on generalized, boilerplate assumptions about criminal habits").

11

activity was his tractor trailer. And, when they sought the warrant, officers knew Defendant parked the tractor trailer at Walmart and did not bring home any items from it.

Even if Defendant used a GPS, online banking, or other means of electronic record-keeping for his alien smuggling operation, we could reasonably infer that he did so on a cell phone. Riley v. California, 573 U.S. 373, 395 (2014) (observing that, as of 2014, over ninety percent of American adults owned a cell phone). But the assumption that a suspect maintains illicit records on a cell phone does "not automatically justify an open-ended warrant to search a home anytime officers seek a person's phone." United States v. Griffith, 867 F.3d 1265, 1273 (D.C. Cir. 2017) (reversing a probable cause determination because the general assertion that gang members "maintain regular contact with each other" was not specific enough to justify the search of a defendant's home for a cell phone). "Instead, such a search would rest on a second assumption: that the person (and his cell phone) would be home." Id. To be sure, many people keep their cell phone in their pocket or otherwise nearby, rather than leaving it at home during a day's work. Id. (citing a poll that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time"). Thus, the government's bare speculation that Defendant may have kept a cell phone in his home, which he could have used in alien smuggling, does not justify the search of his home.

In fact, officers apprehended Defendant before he ever made his way inside his home. And upon searching Defendant and his wife, officers seized a cell phone and keys from each individual outside the home. So Defendant did not have a chance to hide any evidence he ferried with him in his home before officers apprehended him and seized the

item most likely to contain alien smuggling records. See Biglow, 562 F.3d at 1279 (considering "the extent of a suspect's opportunity for concealment"). Thus, the common nature of the evidence sought and Defendant's lack of opportunity for concealment further undermine the government's position that officers had a fair probability of finding evidence of alien smuggling in his home.

Finally, in other contexts, we have required more than an affiant's bare assertions that criminals typically store evidence in their home without corroborating evidence to uphold the constitutionality of a search. Rowland, 145 F.3d at 1204–05 (rejecting the government's proffered "logical inference" that a suspect would store contraband at his home where no information suggested the suspect "previously transported contraband . . . to his home or that he had previously stored contraband at his home"). We cannot rely on the home-storage inference where the home "was but one of an otherwise unlimited possible sites for viewing or storage" and the "affidavit provided no basis to either limit the possible sites or suggest that [the defendant's] home was more likely than the otherwise endless possibilities." Id. at 1205. Although the government suggests that Defendant's home is his only logical storage place, he could have instead conducted business and stored records in his tractor trailer cab—effectively, his office. But officers did not search the tractor trailer cab before they searched his home. The affiant's inferences about where a suspect would store evidence, without corroborating evidence, therefore fail to justify the search of Defendant's home.

Although we often require "little additional evidence" to satisfy the Fourth Amendment's requirements, the government does not provide any specific evidence

13

linking Defendant's alien smuggling to his home. See Biglow, 562 F.3d at 1279 (internal quotations marks omitted). The affiant's general assertions about the tools of the trade are not enough to establish the requisite nexus in this case. To hold otherwise would continue to erode the plain meaning of the Fourth Amendment by nullifying the longstanding principle that probable cause of a crime does not amount to probable cause to search the suspect's home. Rowland, 145 F.3d at 1204. We therefore conclude that the excised affidavit does not provide probable cause to search Defendant's home for evidence of alien smuggling.

C.

Of course, "[e]vidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion." Segura, 468 U.S. at 804. Without the unlawful search of Defendant's home, the government does not establish how the officers would have otherwise discovered evidence of firearm possession underlying Defendant's conviction on appeal.[4] United States v. Larsen, 127 F.3d 984, 987 (10th Cir. 1997)

---

[4] Although the force of the government's argument to the district court focused on exigent circumstances, the government amended its original response to Defendant's motion to suppress to include an inevitable discovery argument. Specifically, the government added two pages to the end of the its fifteen-page response brief to argue that even an excised search warrant affidavit provided probable cause to search Defendant's home and officers would have inevitably found evidence of firearm possession during their search. We acknowledge that the government raised this argument below, but courts generally frown upon parties basing their appellate argument on an issue mentioned only in passing before the district court. See Allen v. Sybase, Inc., 468 F.3d 642, 652 (10th Cir. 2006) ("We are underwhelmed by defendants' inconsistent arguments and limit our review to the position they presented to the district court."); see also Campbell v. Ackerman, 903 F.3d 14, 18 (1st Cir. 2018) ("Our jurisprudence simply does not allow a litigant to switch horses in mid-stream.")

(requiring an "investigation that inevitably would have led to the evidence be independent of the constitutional violation" to admit evidence first obtained through an illegal search). So the exclusionary rule mandates the suppression of that evidence. United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005) (recognizing the exclusionary rule mandates the suppression of evidence obtained as the result of an illegal search). We therefore remand to the district court with instructions to suppress evidence obtained during the search of Defendant's home because the officers lacked probable cause for the search.

IV.

For these reasons, we REVERSE the district court's suppression order and REMAND for further proceedings consistent with this opinion.

19-2097, *United States v. Mora*
**TYMKOVICH**, Chief Judge, concurring.

I concur in the judgment because I agree with the majority that probable cause to suspect a person of a crime does not equal probable cause to search that person's home for a cell phone, computer, or tablet. I write separately to emphasize that, because Mr. Mora operated his business out of his home, this is a closer case than the facts would suggest.

As the majority explains, a warrant is not valid if issued pursuant to an affidavit containing unconstitutionally obtained information that was critical to establishing probable cause. *See United States v. Karo*, 468 U.S. 705, 719 (1984). I agree with the majority that the warrantless sweep of Mr. Mora's home was not justified by an objectively reasonable belief that there were aliens inside the home in need of immediate aid. Thus, the operative question is whether the warrant affidavit—once stripped of the information obtained during the warrantless sweep of Mr. Mora's home—established probable cause to search the home. *See United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

"Probable cause to issue a search warrant exists only when the supporting affidavit sets forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001). But "[p]robable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime." *United States v. Rowland*,

145 F.3d 1194, 1204 (10th Cir. 1998). Instead, the Fourth Amendment requires some additional evidentiary nexus linking a suspect's home to the suspected criminal activity. *Id.* Mr. Mora does not dispute that officers had probable cause to believe he was smuggling undocumented aliens when they applied for a warrant to search his home. Rather, he argues the officers did not have probable cause to believe evidence of such smuggling would be found *in his home.*

Whether a "sufficient nexus has been established between a defendant's suspected criminal activity and his residence . . . necessarily depends upon the facts of each case." *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009). In *Biglow,* we identified three categories of "additional evidence," each of which, standing alone, can satisfy the Fourth Amendment nexus requirement: (1) direct evidence or personal knowledge that the items sought in the warrant application are located in a home, (2) "an affiant officer's statement that certain evidence—in his or her professional experience—is likely to be found in a defendant's residence," and (3) inferences reasonably drawn from the government's evidence. *Id.* at 1279–80. Relevant here are the second and third categories.

As to the second category, we have long recognized judges "may rely on the opinion of law enforcement officers as to where contraband or other evidence may be kept." *Id.* at 1279 (internal quotation marks omitted). But while we routinely credit an affiant's experience, knowledge, and training in evaluating a

warrant application, judges "need not jettison all common sense" and "defer[] to

the officers' experience" in assessing whether there is a fair probability that

evidence of a crime will be found in a particular place. *United States v. Martinez*,

643 F.3d 1292, 1300 (10th Cir. 2011). Above all, the probable cause inquiry is a

"commonsense, practical question" to be informed by the totality of the

circumstances present in any particular case. *See Illinois v. Gates*, 462 U.S. 213,

230–31 (1983).

Per the third category, the requisite "additional evidence" can also take the

form of a common-sense judgment that a given suspect would store incriminating

evidence in his home. We regularly credit inferences that certain types of

criminals are likely to operate out of a home or home office based upon the nature

of the underlying crime.[1] For instance, in *Sanchez*, the challenged warrant

affidavit established probable cause that the defendant was dealing drugs and

further stated that, based on the officer's experience, drug dealers often store

additional quantities of drugs at their homes, along with drug paraphernalia and

their cash proceeds. *United States v. Sanchez*, 555 F.3d 910, 913–14 (10th Cir.

2009). We concluded the affidavit satisfied the Fourth Amendment nexus

requirement because it is "merely common sense that a drug supplier will keep

---

[1] Of course, the categorical nature of the crimes alleged or items sought is not determinative, as the nexus inquiry necessarily depends upon the specific facts presented in the warrant affidavit. *Biglow*, 562 F.3d at 1279.

evidence of his crimes at his home." *Id.* at 914; *United States v. Stein*, 819 F. App'x 666, 669–70 (10th Cir. 2020) (explaining it was reasonable to assume that digital evidence of a conspiracy to use a weapon of mass destruction would be found on electronic devices in the defendant's home because he was tasked with procuring bomb-making materials, which "could be expected to produce a digital trail"); *Anthony v. United States*, 667 F.2d 870, 874–75 (10th Cir. 1981) (explaining it was reasonable to assume the defendant's residence would contain evidence of illegal wiretapping because recording devices must be assembled and he might have assembled the device at his residence).

We have also found a sufficient nexus between a suspect's residence and certain possessory crimes where, given the nature of the contraband and certain corroborating facts, it was reasonable to infer that a suspect would store the contraband at home. For example, in *United States v. Potts*, 586 F.3d 823, 831 (10th Cir. 2009), we concluded it was reasonable to assume the defendant would keep photographs of child pornography in his residence where the warrant affidavit indicated the defendant: (1) owned a computer and was employed as a teacher at two elementary schools; (2) kept child pornography "in a large binder"; and (3) obtained the images by downloading them from the internet, which "could take hours to complete." *Id.* Such factors, we explained, "weigh[ed] against the possibility that [the defendant] might have kept the materials at his workplaces." *Id.*; *see also, United States v. Rahn*, 511 F.2d 290, 292–94 (10th Cir. 1975)

(holding it was reasonable to assume an ATF agent who allegedly possessed stolen guns and had used one to go hunting would keep the gun at home even though "there [were] other places where the guns might have been stored").

Here, the excised warrant affidavit details how the officers discovered the evidence of alien smuggling, found the semi-truck used to transport the aliens, and came to suspect Mr. Mora was the driver. The affidavit further provides that, during questioning, Mr. Mora admitted to owning the semi-truck and explained that "he parks the truck at the Walmart parking lot because he does not have a commercial yard." R., Vol. I at 70. The affiant officer also summarized his relevant training and experience, noting he had "been a federal law enforcement officer for over 18 years in total with Homeland Security Investigations and United States Customs Service" and had acquired knowledge and received training on alien smuggling and human trafficking. *Id.* at 68. Based upon this training and experience, the affiant officer expressed his opinion that alien smugglers use, among other things, cell phones and computers to facilitate their criminal activity and conduct the business side of the crime.

But that was it. As the majority explains, the handwritten bare-bones assertions in the affidavit did nothing to link Mr. Mora and his crime with any specificity to the home. It is true that Mr. Mora worked out of his home. But he parked his rig at a different location. Besides, the officers had little experience

-5-

with alien smuggling operations and so lacked a history from which we could confidently defer to their knowledge and experience about these types of crimes.[2]

While it may be reasonable to infer that Mr. Mora would keep at least one electronic device in his home and that it would contain evidence of alien snuggling, I agree with the majority that this inference, standing alone, cannot satisfy the nexus requirement. Without more, cell phones and home computers and tablets, ubiquitous as they are, would *always* justify a home search. *But see Biglow,* 562 F.3d at 1280; *see also United States v. $149,442.43*, 965 F.2d 868, 874 (10th Cir. 1992) ("Where a suspect has no place of business separate from his residence, it is reasonable for an officer to conclude that evidence may be at the suspect's residence.").

In sum, I think the facts in the affidavit fall just short of establishing a nexus between the suspected alien smuggling and Mr. Mora's home.

---

[2] Supervisor Lucero testified at Mr. Mora's suppression hearing that he had been with HSI since 2001 but had "never seen" a "potential tractor-trailer smuggling load in Albuquerque," making the "whole situation . . . kind of a unicorn to deal with." Aplt. App. Vol. II at 150. Moreover, Agent Lopez—the agent who submitted the warrant affidavit—similarly noted that HSI had "never seen this in Albuquerque" before. Aplt. App. Vol. II at 26.