FILED
**United States Court of Appeals
Tenth Circuit**

**March 9, 2026**

**Christopher M. Wolpert
Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MACKENZIE BECKER,

    Defendant - Appellant.

No. 24-1331

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:23-CR-00285-CNS-1)**
_____

Perrin Tourangeau, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant-Appellant.

Michael F. Houlihan, Assistant United States Attorney (Peter McNeilly, United States Attorney, with him on the briefs), Denver, Colorado, for Plaintiff-Appellee.
_____

Before **HARTZ**, **TYMKOVICH**, and **McHUGH**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

After Defendant Mackenzie Becker apparently discharged a firearm during a road-rage incident, police executed two search warrants for an address associated with Defendant and found evidence used to convict him of firearms and drug charges. He now argues that the district court erred in denying his motion to suppress that

evidence because the affidavit supporting the first warrant did not sufficiently link the road-rage incident to the address searched by the officers. He also contends that his conviction as a felon in possession of a firearm must be reversed because the statute of conviction, 18 U.S.C. § 922(g)(1), violates the Second Amendment.

We affirm. The affidavit established probable cause that evidence of the road-rage incident would be found at the searched house. One could reasonably infer that the house was a residence of Defendant's because a search of law-enforcement databases attributed the address to him, and police surveillance corroborated the attribution: the car Defendant drove during the incident was parked in the house's driveway and he was observed washing his car there and entering and exiting the house. Also, one could infer that Defendant would keep the firearm at his residence. That three weeks passed between the incident and the application for the warrant did not undermine that inference. And Defendant's Second Amendment challenge is foreclosed by this court's precedents.

## I.    BACKGROUND

The alleged road-rage incident occurred on February 13, 2023. Detective Gerald Sloan of the Denver Police Department investigated the incident. Detective Sloan's affidavit for a search warrant described as follows the results of the investigation:

The victim told officers that he observed a driver commit several egregious traffic violations while merging onto the interstate. When the victim pulled alongside the other driver to "speak" with him, the driver brandished a firearm. R., Vol. 1 at 37.

Fearing for his safety, the victim drove toward the nearest exit. The other driver followed, pulled alongside the victim, and fired a shot in his direction.

The victim took a picture of the other vehicle. Although it showed a gray automobile, DMV records for the license plate in the picture reported that the plate was attributed to a green Saab. As we shall see, there turned out to be two Saabs associated with Defendant—one green and one gray—that bore license plates with the same number.

According to the DMV records, the green Saab was registered to Defendant with an address at an apartment at 1302 South Parker Road. Defendant's driver's-license photo matched the description given by the victim. Detective Sloan also discovered that there were several active arrest warrants for Defendant and that he had two prior felony convictions, which prohibited him from possessing a firearm.

Officers visited the apartment address and found a green Saab bearing the same plate number as the car from the incident, but the car appeared to be abandoned. Although the plate was apparently a front plate (it had no registration stickers), it was attached to the car's rear. A search of records from license-plate readers revealed that a plate with the same number had been observed on a gray Saab sedan 10 days before the road-rage incident.

Detective Sloan searched "several law enforcement databases," *id*. at 38, and found a second address attributed to Defendant—a house on West Iliff Lane. Although the affidavit did not specify all the databases checked by Sloan and where he found what, the affidavit elsewhere notes that he looked at DMV records and

3

researched Defendant "through the National Crime Information Center ('NCIC') and the Colorado Crime Information Center ('CCIC')." *Id*. at 38.

On March 1, about two weeks after the road-rage incident, officers visited the West Iliff Lane house. They found a gray Saab parked in the driveway. The affidavit describes the gray Saab as "identical" to the car involved in the incident, *id*. at 41, and the gray Saab bore a license plate with the same number as both the car from the incident and the green Saab previously seen at the South Parker Road apartment. On the officers' return five days later they observed Defendant exiting the house and entering the gray car several times. They also observed him hand-washing the car in the house's driveway.

On March 7 Detective Sloan obtained a warrant to search the West Iliff Lane house and the gray Saab for, among other things, firearms, ammunition, and items that would establish who controlled the premises. The supporting affidavit included the following paragraph:

> Your Affiant believes that whether or not the firearm sought is recovered, the above items would tend to show that a firearm existed and may have once been located in a place to which the suspect had access and that these items would tend to connect the suspect with the weapon sought. A firearm is not normally disposed of after the commission of a crime, and it is, therefore, still likely to be found in any location or vehicle to be searched associated with BECKER. Furthermore, Your Affiant believes, based on several law enforcement records, including the sighting of BECKER, that BECKER resides at the SUBJECT PREMISES. Your Affiant would like to remind the courts that BECKER is a fugitive of justice.

*Id*. at 41–42.

4

A state magistrate judge approved the search warrant that same day, and police executed the warrant two days later. Because the officers discovered evidence of drug trafficking, they paused to obtain a second warrant to search the house for further evidence. They found fentanyl, cocaine, firearms, and ammunition.

Defendant was indicted in the United States District Court for the District of Colorado on four gun and drug charges. He moved to suppress the evidence of the searches, arguing that the affidavit underlying the first search warrant was not supported by probable cause because it did not establish a nexus between the alleged criminal activity and the address searched. (If the first search was unlawful, evidence seized during the second search would also be inadmissible as fruit of the first search.) The district court denied the motion. Defendant pleaded guilty to possession with intent to distribute fentanyl, possession with intent to distribute cocaine, and being a felon in possession of a firearm and ammunition, but he preserved his right to appeal the suppression ruling.

## II.    DISCUSSION

Defendant challenges the warrants to search the West Iliff Lane house, and, to preserve the question for future review, he argues that 18 U.S.C. § 922(g)(1) is unconstitutional facially and as applied to him.

### A.    Probable Cause

"A search warrant can issue only upon a showing of probable cause, meaning that the supporting affidavit must provide a substantial basis to conclude that there is a fair probability that contraband or evidence of a crime will be found in a particular

place." *United States v. Alqahtani*, 73 F.4th 835, 842 (10th Cir. 2023) (brackets and internal quotation marks omitted). We review the district court's factual findings for clear error, viewing the evidence in the light most favorable to the findings. *See United States v. Sadlowski*, 948 F.3d 1200, 1203 (10th Cir. 2020). We review de novo its determinations relating to the sufficiency of the warrant. *See id*. But "[w]e afford a magistrate judge's probable cause determination" to support a search "great deference" and "review merely to ensure the Government's affidavit provided a substantial basis for reaching that conclusion." *Id*. (internal quotation marks omitted).

### 1.     *Nexus between Defendant and the address*

Defendant first contends that Detective Sloan's affidavit did not support the inference that Defendant lived at the West Iliff Lane address. He points out that the warrant did not provide any account of a substantive investigation ruling out the South Parker Road apartment as Defendant's residence and confirming who owned or rented the West Iliff Lane house. Defendant also argues that the affidavit relied on vague references to police databases without identifying the contents of those databases. He relies on *United States v. Roach*, 582 F.3d 1192, 1203 (10th Cir. 2009), for the proposition that "'a warrant must be supported by facts demonstrating probable cause, not by police summaries of what they have concluded from such facts.'" Aplt. Br. at 15 (quoting *Roach*, 582 F.3d at 1203 (emphasis omitted)). The support for the inference of a fair probability that Defendant lived at the West Iliff Lane address—the use of "several law enforcement records, including the sighting"

6

of Defendant—is to Defendant a bare "police summar[y]" that is not sufficient to establish probable cause. Aplt. Br. at 15 (internal quotation marks omitted).

But, as the government argues, Defendant misapprehends what *Roach* deemed a "police summar[y]" and why it was insufficient. *Roach*, 582 F.3d at 1203. The defective affidavit in *Roach* linked 33 gang members to 15 different addresses with the general statement that "[o]fficers have verified that the individuals listed below live at the following addresses, through investigations, which included checking for utilities information, driver's license records, real estate records, Wichita Police Department records, tax records, social security records, U.S. Postal Service records, interviews and/or surveillance." *Id*. at 1202 (internal quotation marks omitted). From that broad assertion, the reviewing magistrate judge could not determine which of the listed methods was used to verify each defendant's address. *See id*. at 1203. The only remaining support in the affidavit for the probable-cause determination was the "police summar[y] of what they had concluded," namely that "officers have verified that the individuals listed below live at the following addresses," which did not suffice. *Id*.

What *Roach* expressly did *not* take issue with was the described methods of linking the defendant to the address—"checking for utilities information, driver's license record*s*, real estate records, *Wichita Police Department records*, tax records, social security records, U.S. Postal Service records, interviews and/or surveillance." *Id*. at 1202 (emphasis added); *see id*. at 1202–03 ("Of course, the difficulty with this statement is *not* that the methods described, if each and every one were successfully

7

used to link Roach to 1441 N. Minneapolis, would be insufficient. Rather, it is that the statement as phrased does not reveal which of these methods was, in fact, used by police to connect Roach to the premises"). Detective Sloan had success here with at least one of these investigative methods (checking law-enforcement records). Even though his affidavit did not state which law-enforcement databases associated Defendant with the West Iliff Lane house, it is clear that at least one linked him to the address. *See also United States v. Sanchez*, 725 F.3d 1243, 1248–49 (10th Cir. 2013) (distinguishing *Roach* because "the affidavit here specifically stated the investigatory techniques used to verify [the defendant's residence]: searches of state and local databases and a telephone company's subscription records").

Moreover, the database information was corroborated by the affidavit's account of observations of Defendant at the address. Officers found the sedan from the road-rage incident parked at the address, and Defendant was seen washing it in the driveway and repeatedly entering and exiting the house. The affidavit established a fair probability that the house was a residence of Defendant's.

### 2.    *Nexus between the incident and the address*

Defendant next argues that even if the affidavit connected him to the West Iliff Lane house, it did not link the road-rage incident to that address because three weeks passed between the incident and the application for a search warrant, so officers could no longer reasonably infer that the firearm would be at Defendant's residence. Firearms, Defendant contends, are easily concealed and disposed of and therefore, under *United States v. Rowland*, the firearm's continued presence at the West Iliff

8

Lane house was no "more likely than the otherwise endless possibilities." 145 F.3d 1194, 1205 (10th Cir. 1998). Defendant discounts the affidavit's assertion that "[a] firearm is not normally disposed of after the commission of a crime," R. Vol. 1 at 41–42, because "'[f]or an officer's experience and training to support a finding of probable cause, the affidavit must set out *facts* explaining why, based on this experience and training, there was reason to believe the contraband is more likely to be found at the particular location.'" Aplt. Br. at 18 (quoting *United States v. Mora*, 989 F.3d 794, 802 (10th Cir. 2021)).

We disagree. Defendant seeks to apply *Rowland*'s language to facts quite different from those it was referencing. In that case, officers searched the defendant's home after he picked up video tapes containing child pornography from his post office box. *See Rowland*, 145 F.3d at 1199–1200. The affidavit supporting the search warrant stated that officers anticipated that the defendant would pick up the tapes from the box, take them with him to his workplace, and then take them home, but it did not suggest that the defendant had ever actually transported contraband to his house or stored it there. *See id*. at 1204. We held that the house was "but one of an otherwise unlimited possible sites" that the defendant could have taken the tapes for viewing or storage, but the warrant provided no basis to rule out those other sites. *Id*. at 1205. *Rowland* recognized that "[p]robable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime," and a search warrant's supporting affidavit must provide "additional evidence linking

9

the person's home to the suspected criminal activity." *Id*. at 1204. But supplying this "additional evidence" is not so high a bar as Defendant suggests.

For example, in *United States v. Harris*, 735 F.3d 1187, 1191 (10th Cir. 2013) (Gorsuch, J.), we upheld a search warrant for the defendant's auto shop against a challenge that invoked *Rowland*. The warrant affidavit established that there was a "fair probability" that a stolen van used in a murder under investigation would be hidden in the auto shop. There was evidence that a Mr. Johnson had provided the van, had attempted to evade officers before proceeding to the shop (which had served as a front for illegal activity in the past), and used a key to enter the locked shop. *See id.* at 1190–91. An officer also attested that individuals involved in a violent crime sometimes hide evidence at a friend's or a common "'clubhouse.'" *Id.* at 1190. We said that "[t]his just isn't a case like *Rowland* where police sought to search a place associated with the defendant (let alone his home) only because they suspected the defendant of a crime." *Id*. at 1191. In *Harris* there was "'additional evidence'" suggesting a link between the crime and the place to be searched. *Id*.

Likewise, Detective Sloan's affidavit supplies additional evidence linking the West Iliff Lane house to the offense. We have already noted the evidence that the house was a residence of Defendant's. And law-enforcement experience, precedent, and common sense strongly support an inference that the firearm would be kept at the user's residence. Detective Sloan's affidavit stated that "[a] firearm is not normally disposed of after the commission of a crime," and the one that Defendant used during the road-rage incident was "still likely to be found in any location or vehicle to be

searched associated with [Defendant]." R., Vol. 1 at 41–42. This last point has been repeatedly recognized by the courts. *See, e.g.*, *Alqahtani*, 73 F.4th at 844 ("[A] personal firearm is the type of evidence likely to be kept in a suspect's residence" (brackets and internal quotation marks omitted)); *United States v. Rahn*, 511 F.2d 290, 293 (10th Cir. 1975) (reasonable to assume that the defendant kept weapons in his home); *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (same); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) (endorsing view of the Fifth and Eighth Circuits that firearms are generally kept at home or with their owner). *But see United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979) (holding it was unlikely that a defendant would hide in his home a firearm used in a murder). In our view, there was certainly a *fair probability* that the firearm used in the incident, and evidence of the firearm, could be found at the West Iliff Lane house.

Defendant argues that because three weeks had passed between the road-rage incident and Detective Sloan's application for the warrant, the firearm "truly could have been anywhere." Aplt. Br. at 18. We do not dispute that an extended period between the criminal activity and the issuance of the search warrant could undercut the inference that contraband is still in a defendant's possession or at the defendant's residence. *See Alqahtani*, 73 F.4th at 844 ("Probable cause cannot be established if information has grown stale, i.e., if too much time has passed between the receipt of information and the issuance of the warrant"). But three weeks is hardly enough time to defeat the inference that the firearm was at Defendant's residence. That inference

11

can endure "for an extended period of time."[1] *Id.* (holding that there was probable cause that a firearm was still in the defendant's residence even though it was last seen there five months ago); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (holding that there was reason to believe a firearm would remain in defendant's home almost three months after he robbed a bank). It would seem unlikely that Defendant would dispose of the firearm when his prior felony conviction would make it that much more difficult to acquire a replacement. And here officers knew that another, and more observable, instrumentality of the crime—the gray Saab—remained at the same address.

Defendant's reliance on *Mora*, 989 F.3d at 802, is misplaced. In *Mora* we considered searches of a defendant's home after he had smuggled aliens across the border in the back of a tractor trailer. *See* 989 F.3d at 798. Officers found the trailer in a Walmart parking lot shortly after the aliens had been dropped off and hurried to the defendant's home before his return; they arrested him there and performed an unjustified protective sweep of his house. *See id.* at 797–98. The government argued that a search warrant, which was issued in reliance on evidence found during the

---

[1] In his reply brief, Defendant challenges this proposition by citing the divided opinion in *United States v. Wilson*, 153 F.4th 478 (5th Cir. 2025), which postdated the government's response brief. This out-of-circuit opinion is not binding on us and is inconsistent with our precedents. *Compare id.* at 486 (firearms are "portable, easily transferred, and often quickly discarded" and thus the likelihood that a firearm stored at home remains there "'quickly dwindles' with each passing day"), *with Rahn*, 511 F.2d at 293 (finding it reasonable to assume that individuals keep firearms in their homes for long periods of time, even though the firearm had never been observed at that location).

unlawful sweep, was nonetheless justified because there was probable cause that the officers would find evidence of alien smuggling in the home. *See id*. at 800–01. We said that when determining whether there is a sufficient nexus between a crime and a suspect's home to justify a search of the home, some factors that courts may consider are "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence." *Id*. at 801. Drug smuggling, for example, is part of "a special class of crimes where we have not required particular facts to support the inference that a drug trafficker keeps his supply at his residence" because that factual "gap can be filled merely on the basis of the affiant-officer's experience that drug dealers ordinarily keep their supply, records and monetary profits at home." *Id*. (internal quotation marks omitted). *Mora* concluded that "alien smuggling is not part of that special class where we have held that probable cause that a defendant committed the crime suggests the concealment of evidence in the home." *Id*.

A firearm, however, belongs to that special class. As we recently stated, "[A] personal firearm is the type of evidence likely to be kept in a suspect's residence, and is likely to remain there for an extended period of time." *Alqahtani*, 73 F.4th at 844 (citations, brackets, and internal quotation marks omitted); *see* 2 Wayne R. LaFave, Search & Seizure § 3.7(d), at 539–40 (5th ed.) ("Where the object of the search is a weapon used in the crime or clothing worn at the time of the crime, the inference that the items are at the offender's residence is especially compelling, at least in those

13

cases where the perpetrator is unaware that the victim has been able to identify him to the police").

Because we hold that the warrant was supported by probable cause, we need not consider the government's alternative argument that suppression of the evidence would be improper because officers executed the warrant in good faith.

## B.    Second Amendment Challenge

Defendant argues that 18 U.S.C. § 922(g)(1), which disarms those "who ha[ve] been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year," is unconstitutional.[2] He seeks to preserve this challenge in case the Supreme Court hears a case addressing the constitutionality of § 922(g)(1) before his conviction becomes final.

But Defendant concedes that, at least for now, this argument is foreclosed by our precedents. We rejected a constitutional challenge to § 922(g)(1) in *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023), *vacated and remanded*, 144 S. Ct.

---

[2] In addition to a facial challenge, Defendant challenges the statute "as applied to persons like [himself]" because there is no "relevantly similar historical tradition of firearm dispossession with respect to the circumstances of [his] case." Aplt. Br. at 27. This argument is perfunctory. Defendant does not explain how the statute would be unconstitutional as applied to individuals who, like him, have previously been convicted of violent felonies including aggravated menacing, domestic violence, and third-degree assault. Thus, we decline to consider the as-applied challenge separately. *See* Fed. R. App. P. 28(a)(8)(A) (appellant's opening brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *United States v. Clay*, 148 F.4th 1181, 1201 (10th Cir. 2025) ("We thus will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, in the opening brief" (internal quotation marks omitted)).

14

2708 (2024) (for reconsideration in light of *United States v. Rahimi*, 602 U.S. 680 (2024)), *and readopted sub nom.*, *Vincent v. Bondi*, 127 F.4th 1263, 1264 (10th Cir. 2025), *cert. denied*, No. 24-1155, 2026 WL 568283 (U.S. Mar. 2, 2026). Because Defendant concedes that we have already decided the issue of § 922(g)(1)'s constitutionality against him, he has failed to identify an error upon which we could reverse.

### III.    CONCLUSION

We **AFFIRM** the judgment of the district court.