**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-4193**

---

UNITED STATES OF AMERICA,

            Plaintiff – Appellee,

v.

JESSIE LEROY GLASS, JR.,

            Defendant – Appellant.

---

Appeal from the United States District Court for the Western District of North Carolina, at Statesville.  Kenneth D. Bell, District Judge.  (5:21−cr−00060−KDB−SCR−1)

---

Argued:  October 21, 2025                                    Decided:  December 2, 2025

---

Before WILKINSON, GREGORY, and BERNER, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Gregory and Judge Berner joined.

---

**ARGUED:**   Melissa Susanne Baldwin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Asheville, North Carolina, for Appellant.  Amy E. Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:** John G. Baker, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlotte, North Carolina, for Appellant.  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

Detective Jason Lowrance obtained two warrants to search the home and electronics of Jessie Glass after Glass's second wife, April, reported seeing child sexual abuse material ("CSAM") on his cell phone. Glass claims the affidavits that Lowrance drafted to support these warrants recklessly omitted known information that would have undermined April's credibility.

But Glass does not satisfy his heavy burden. Consistent with the Supreme Court's long-held preference for warrants, we must extend some grace to warrant affidavits. And here, any omissions were immaterial to the state superior court judge's probable cause findings. We thus affirm the district court's denial of Glass's motion to suppress the evidence seized from the warrants. We further reject his argument under the Double Jeopardy Clause, as well as his challenge to a $5,000 assessment under 18 U.S.C. § 2259A.

I.

In late 2019, April reported to law enforcement that Glass had "a massive amount of child porn saved on his phone." J.A. 409. She provided the email address and suspected password for Glass's Google Photos account, wherein he reportedly kept much of the CSAM. April added that she was married to Glass but had moved out of the house, expressing fear of violent retaliation from him and his father if they learned about her report.

A.

Shortly thereafter, Lowrance began looking into her claims. He telephoned April, learning more about the CSAM she saw. In later correspondence, she reemphasized these

allegations while airing other grievances, such as how she once "told [Glass] off" about an alleged arrest, J.A. 396, and how she hoped for a divorce and alimony "due to [Glass] causing [her] to lose [her] kids," J.A. 413.

Lowrance arranged an in-person meeting between April and Heather Brown, a police officer in Virginia. During it, April reported seeing at least fifty images of CSAM on Glass's phone, including some recent additions, and detailed the contents of several that she remembered. To call them disturbing would be an understatement: examples include a video of "someone [appearing to] touch[] the genital area" of a baby with "a bag over the child's head;" "[a] photo of . . . an adult male forcing his penis in [an] infant's mouth;" and "[a] video of an adult male," who April worried was Glass, "making a prepubescent female appearing to be 8 or 9 years old put his penis in her vagina." J.A. 70. April explained that Glass used social media to coax young girls into sending him pictures, and she specified the appearance and probable locations of various electronics he owned.

Lowrance also searched April's criminal history, discovering she had a pending misdemeanor larceny charge for shoplifting at a Walmart. He subsequently learned about another then-ongoing investigation into April for shoplifting. Lowrance likewise ran Glass's name through a crime database. In so doing, he found two prior investigations into Glass for suspected child pornography.

One was in 2012. Glass's first wife reported to the police that she had repeatedly witnessed him view CSAM. Glass was eventually indicted on two counts of forcible sodomy against a minor. However, one charge was dropped by the prosecution while the other was dismissed upon acquittal in a bench trial.

3

The second was in 2016. April's mother turned over to the police photographs of CSAM that April had reportedly found on Glass's phone. Brown then interviewed April and Glass, deeming the former's accusations credible and the latter's explanations not. She held the case open for over a year, "hoping that something could have been done with it." J.A. 175–76. But she ultimately closed the file after being unable to find any authorities in North Carolina (the location of Glass's suspected crimes) willing to take the case.

In addition to these two investigations, Lowrance personally knew about a third. In 2017, April accused Glass of having "tablets . . . full of child porn." J.A. 314. With Glass's consent, responding officers questioned him and searched his home for CSAM, finding none there. They also retrieved a tablet that Glass volunteered. Lowrance, for his part, helped draft the application for a warrant to search the tablet and, upon the warrant being issued, executed the search. It too yielded no CSAM. Another detective thus closed the case for being "[u]nfounded." J.A. 93. In that officer's words, "unfounded" was "one of the dispositions" available on the reporting system used by state law enforcement whenever they could not "find any particular evidence that the crime [they] were investigating at that time occurred." J.A. 206.

### B.

Against this backdrop, Lowrance drafted an affidavit supporting his application for a warrant to search Glass's home for both electronic devices and equipment capable of storing images. In it, he summarized his investigation into April's accusations. Specifically, he recounted her 2019 report about witnessing CSAM on Glass's phone, including the probable login information to access the account where Glass "ke[pt] the images in" its

4

"trash bin." J.A. 69. He next detailed the revelations from Brown's in-person meeting with April, reciting April's vivid recollections of seven images of CSAM, explaining Glass's practice of messaging girls online for pictures, and relaying the descriptions and locations of his electronics. Lowrance also noted Glass "had been investigated in Virginia for similar reports in 2012 and 2016." J.A. 69.

Based on this information, a North Carolina superior court judge issued the warrant. Police executed it the next day, locating several electronics in Glass's house. They also found Glass at work, where he turned over a cell phone to be searched. Lowrance then obtained another warrant, authorizing the device's search. To do so, he attached an affidavit containing the same information as the first one, while adding a description of the officers' interactions with Glass.

With these warrants in hand, law enforcement officers searched the devices. They found evidence that the cell phone retrieved from Glass's person had once accessed 395 unique images depicting child sexual abuse. The device also showed that Glass had saved links and accessed a website containing hundreds of shared videos with similar material. And on another cell phone, police found seventy-two images, all unique, depicting CSAM.

C.

A federal grand jury indicted Glass, charging him with three counts of receiving child pornography and one count of possessing child pornography involving a minor under twelve years old. *See* 18 U.S.C. § 2252A(a)(2), (a)(5)(B), (b)(1)–(2).

Glass moved to suppress the evidence seized from the searches of his home and electronics, alleging Lowrance intentionally or recklessly omitted information from his

5

affidavits that would have cast doubt over April's veracity and thereby defeated probable cause. For our purposes, four such omissions bear highlighting: One, Lowrance did not mention April's 2017 accusations, the investigation into which ended as "[u]nfounded." Two, he did not specify that the 2016 allegations likewise originated from April (through her mother) and did not result in Glass's arrest. Three, Lowrance did not expressly state that April was the estranged spouse of Glass who repeatedly butted heads with him; the affidavits noted only that they both had the last name "Glass" and that April had reportedly "left around the end of December." And four, Lowrance did not disclose April's then-pending charge and then-ongoing investigation for larceny.

The district court held a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), during which it heard testimony from Lowrance, Brown, and the officer who attached the "[u]nfounded" label to the 2017 investigation. The district court then denied Glass's motion for two independent reasons: First, it found that Lowrance neither intended to mislead the superior court judge nor omitted information from his affidavit recklessly. Instead, he made at most an "honest mistake" that, "even if it w[as] negligent, is simply insufficient to satisfy the" requisite showing of perjury or reckless disregard for a *Franks* violation. J.A. 483. Second, the district court concluded that, though disclosure of the excluded information would have "somewhat reduce[d] [April's] reliability," "none of these omissions—even when viewed together—change the probable cause finding." J.A. 483–86. This too defeated Glass's *Franks* claim.

So Glass's case went to trial, and the jury returned a guilty verdict on all counts. The district court thereafter sentenced him to fifteen years' imprisonment for each, to be

6

served concurrently, and a lifetime of supervised release. It also imposed a $5,000 special assessment under 18 U.S.C. § 2259A and ordered Glass to pay $6,000 in restitution under 18 U.S.C. § 2259(b)(2).

Glass appeals, making three contentions. He first takes issue with the district court's denial of his motion to suppress. He then claims the district court violated the Constitution's Double Jeopardy Clause by entering judgment on the three receipt counts that, as he sees things, all rest on the same underlying criminal conduct. He lastly criticizes his $5,000 assessment, alleging the district court failed to discuss numerous considerations required by statute. We address each contention in turn.

## II.

According to Glass, Lowrance recklessly omitted information about April from his affidavits, the inclusion of which would have defeated probable cause. We disagree.

## A.

The interests in both privacy and law enforcement are heightened in cases of this sort. Not only is the privacy of the home implicated, but the interests of the homeowner in his electronic devices, such as cell phones and computers, are every bit as strong as the intimate personal effects under lock and key in the old desk drawer. So also, however, are the interests of law enforcement heightened by the ability of modern technology to assist in committing and concealing criminal activity. But this is no reason to recoil from the contemporary context. It is a tribute to our founding framework that the Constitution and Supreme Court decisions interpreting it are readily adaptable to the modern iterations of the ancient tensions the Fourth Amendment was adopted to address.

7

Recall, therefore, the background legal principles in play. When officers seek to perform a search for evidence of wrongdoing, they "generally" must obtain a warrant. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). And "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. Through this language, the Framers responded "to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014).

Their solution proved wise. The Fourth Amendment's warrant process "interposes an orderly procedure under the aegis of judicial impartiality." *United States v. Jeffers*, 342 U.S. 48, 51 (1951) (citing *Johnson v. United States*, 333 U.S. 10 (1948)). In particular, it requires "informed and deliberate determinations" by neutral and detached magistrates about the reasonableness, and therefore the lawfulness, of searches. *United States v. Lefkowitz*, 285 U.S. 452, 464 (1932). Without this protection, individual privacy would freely yield to mistakes caused by the "hurried action[s] of officers" who are "engaged in the often competitive enterprise of ferreting out crime." *Johnson*, 333 U.S. at 14 & n.3 (quoting *Lefkowitz*, 285 U.S. at 464).

For all these reasons, the Supreme Court has long conveyed "a strong preference for warrants." *United States v. Leon*, 468 U.S. 897, 914 (1984). By natural extension, it has repeatedly counseled against overly scrutinizing the *affidavits* supporting warrants. *E.g.*, *United States v. Ventresca*, 380 U.S. 102, 108 (1965). After all, "[t]hey are normally drafted

8

by nonlawyers in the midst and haste of a criminal investigation." *Id.* If courts demanded perfection in this often fast-paced exercise, "police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search." *Illinois v. Gates*, 462 U.S. 213, 236 (1983). Accordingly, we must refrain from nitpicking warrant affidavits with clarity afforded only by hindsight and the absence of an urgent, ongoing criminal investigation.

### B.

With these guideposts in mind, we reiterate that "[a]n accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). A "narrow exception" is made, however, for affidavits containing material misinformation. *Id.* In this setting, we suppress evidence obtained by a warrant if the defendant establishes "by a preponderance of the evidence" that, sans the "false material" caused by the affiant's "perjury or reckless disregard," the affidavit would have been "insufficient to establish probable cause." *Franks*, 438 U.S. at 156.

This exception covers lies by omission, too. That is, if an affiant "omitted material facts that when included would defeat a probable cause showing," and if "the omission was designed to mislead or was made with reckless disregard of whether it would mislead," then the exclusionary rule applies. *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008). At the same time, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). Consequently, omission-based attacks to affidavits trigger "an

9

even higher evidentiary burden" than challenges based on false disclosures. *United States v. Moody*, 931 F.3d 366, 374 (4th Cir. 2019) (citing *Tate*, 524 F.3d at 454–55).

1.

Glass falls short of this high bar. Start with what Lowrance's affidavits disclosed: April attested in person to repeatedly seeing CSAM on Glass's phone, tendering graphic descriptions of numerous images. She gave precise directions about where to find Glass's electronics, as well as how to likely access the pornography he stored online. She also explained how Glass would solicit pictures from young girls using social media.

All this information is "detailed and specific." *Ventresca*, 380 U.S. at 109. It spells out the informant's "basis of knowledge," that is, "the particular means by which" April "came by the information given in h[er] report." *Gates*, 462 U.S. at 228. Indeed, April not only revealed her identity, but also met face-to-face with an officer, bolstering credibility. *United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000). And her report concerned a suspect who was likely "involved in" similar offenses "in the past," *United States v. Miller*, 925 F.2d 695, 699–700 (4th Cir. 1991), given the at least two "similar reports" lodged against Glass earlier, J.A. 69, 85.

Glass asserts that April's allegations about witnessing CSAM on his *cell phone* (a portable device usually held close on one's person) did not justify a warrant to search his *home*. But for support, he cites just two out-of-circuit cases that concerned search warrants of homes for portable communications devices where, crucially, the police had *no* reason to think that the defendants even owned them. *See United States v. Griffith*, 867 F.3d 1265, 1272–73 (D.C. Cir. 2017); *United States v. Mora*, 989 F.3d 794, 801–02 (10th Cir. 2021).

10

By contrast, the affidavits here not only referenced Glass's possession of a cell phone containing CSAM. *See United States v. Grinder*, 808 F. App'x 145, 147 (4th Cir. 2020) (per curiam) (distinguishing *Griffith* on this basis). They also specified the existence of "two laptops at [Glass's] residence," J.A. 70, 86, which could reasonably have been thought to contain evidence of his receipt and possession of CSAM. As written, then, Lowrance's affidavits established probable cause to search not just his cell phone, but also his residence.

2.

Turning to the undisclosed facts, consider first Lowrance's nonmention of the 2017 investigation that closed as "[u]nfounded"—the omission that Glass labels "most significant." Oral Arg. at 10:18–10:22. Just because this prior case did not churn up concrete evidence, however, does not mean April fabricated her claims against Glass. According to the detective who gave the "[u]nfounded" designation, this label was simply selected among a preset menu of dispositions and used whenever state law enforcement could not find "any particular evidence" of crime. J.A. 206. The revelation that police could not find the reported tablets containing CSAM—that is, readily concealable material on readily concealable electronics—would not have undermined the probable cause generated by April's very specific allegations two years later. *See United States v. Bosyk*, 933 F.3d 319, 327 (4th Cir. 2019) ("[C]onsumers of child pornography frequently employ complex measures to keep their online activities secret."). Indeed, a magistrate may have found that the 2017 investigation further *inculpated* Glass by showing he had previously been investigated not just twice, but three times, over five years for alleged CSAM possession.

11

The same logic applies to the affidavits' nondisclosure about April's role in the 2016 investigation, which ended without any prosecution of Glass. Again, probable cause does not dissipate simply because a witness's previous, similar reports against the defendant went without criminal consequences. There are many reasons to drop a case, including prosecutorial priorities and resources, that have absolutely nothing to do with a particular witness's capacity for truthfulness. Moreover, any failure to detail the outcome of the 2016 investigation (or any prior investigation for that matter) in no way reflected guilt on the part of Glass. In fact, at no point did the affidavits suggest that Glass had been found guilty of anything. As the district court noted, the state superior court judge would have assumed as much.

Equally unavailing is the affidavits' omission that April was Glass's estranged wife. A competent reader could reasonably have inferred this fact: The affidavits gave the same last name for April and Glass. They said that April "left" Glass after being close enough to him to both observe CSAM on his cell phone and know precisely how he accessed it. J.A. 69, 85. And they did not mention any other familial tie between them. Regardless, given allegations as disturbing as those that April levied against Glass, it should come as no surprise the two suffered marital strife. This friction, even if explicitly disclosed, would not have cast doubt over April's truthfulness. *See United States v. Hodges*, 705 F.2d 106, 108 (4th Cir. 1983) ("Even if we accept the inference that [the defendant's ex-girlfriend] harbored ill will toward [the defendant], her credibility cannot be rejected on this ground.").

That leaves the omissions about April's larceny charge and investigation. They do not move the probable cause needle, either. While "[s]hoplifting" at a Walmart "of course[]"

12

does involve dishonesty of a certain kind," *United States v. Amaechi*, 991 F.2d 374, 378 (7th Cir. 1993), it fails to indicate that April would falsely accuse her spouse of possessing CSAM—an unrelated, and far more serious, offense, *see Abshire v. Walls*, 830 F.2d 1277, 1281 (4th Cir. 1987).

C.

The disclosure of these omitted facts, taken together, would not have defeated probable cause. As the Supreme Court has "frequently" noted, "probable cause is a flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion), asking merely whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place," *Gates*, 462 U.S. at 238. This "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014).

To the extent any of the omitted details about April cast doubt over her credibility, they do not suffice to undermine the affidavits' clear showing of probable cause. "Finely tuned standards such as proof beyond a reasonable doubt . . . have no place in the [probable cause] decision." *Gates*, 462 U.S. at 235. At the end of the day, the past reports against Glass for similar offenses, as well as April's specific allegations against him (made face-to-face with an officer, no less), sufficed to generate a "'practical, nontechnical' probability" that the warrants would yield incriminating evidence—even when knowing the history about April that Glass emphasizes here. *Texas*, 460 U.S. at 742 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

13

III.

The district court likewise did not run afoul of double jeopardy principles. The Double Jeopardy Clause, of course, protects against being "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Included in this guarantee is a prohibition against the government dispensing "multiple punishments" to a defendant "for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). In determining whether offenses are the same in fact, we consult "'the entire record' of the proceedings"— "not . . . the indictment language only." *United States v. Schnittker*, 807 F.3d 77, 82 (4th Cir. 2015) (quoting *United States v. Benoit*, 713 F.3d 1, 17 (10th Cir. 2013)).

Recall that Glass's charges included three receipt counts. Specifically, his indictment alleged that he "knowingly received any child pornography," in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1), on three occasions: first, "[o]n or about February 4, 2020;" second, "[b]etween on or about January 8, 2020, and February 4, 2020;" and third, "[b]etween on or about January 8, 2020, and on or about February 5, 2020." J.A. 15–16.

Because this language and the jury instructions did not explicitly link unique images of CSAM to each of Glass's three receipt counts, he alleges the district court unconstitutionally entered judgment on all of them when the jury, in substance, convicted him of just one offense. Glass concedes he did not raise this argument below, meaning we review it for plain error. *See* Fed. R. Crim. P. 52(b).

There was no plain error here. Glass's indictment alleged different ranges of dates for each offense. Consistent with this specification, the jury heard evidence that Glass downloaded one video of CSAM at 8:51 p.m. on February 3, 2020; another roughly twenty-

14

five minutes later; and a third the next day. The jury also learned that each video was a distinct file. Further, in its closing argument, the prosecution specifically linked these files to counts one through three, respectively. The entire record thus clearly demonstrates that the jury's convictions, and the district court's judgment, comported with the Double Jeopardy Clause.

While Glass analogizes his facts to those in *Benoit*, that decision only bolsters our conclusion. There, the Tenth Circuit found a double jeopardy violation after the defendant was convicted on two counts of receiving child pornography. *Benoit*, 713 F.3d at 18. To do so, the panel pointed out that the at-issue indictment alleged the exact same date range for both receipt counts, that no evidence at trial "suggest[ed] to the jury that the two counts related to distinct images," and that "both the prosecutor and defense counsel expressly stated to the jury that the two counts were based on identical conduct." *Id.* at 17. None of those critical facts exist here.

Glass contends that his indictment could have distinguished the receipt counts by using file names to refer to each image of child pornography. But the fact that another method of specification is possible does not mean that it is constitutionally mandated. Glass also stresses that the district court reminded jurors about their "sworn duty to follow the law as the Court," not the parties, "instruct[ed]," J.A. 1027, and that the court's instructions did not distinguish the receipt counts. This too makes no difference; the arguments and evidence at trial repeatedly connected distinct files to each receipt count, and the district court never indicated the jury could return multiple guilty verdicts based on one image.

15

Again, our inquiry is a flexible one taking account of "the entire record." Doing so reveals no plain error here.

IV.

The entire record also supports the district court's $5,000 special assessment under 18 U.S.C. § 2259A. That statute provides a district court "shall" assess "not more than $35,000 on any person" convicted of certain offenses related to trafficking child pornography, including the receipt counts here. 18 U.S.C. § 2259A(a)(2). In its calculation, the district court must take account of the sentencing considerations in 18 U.S.C. § 3553(a) and the factors that guide the imposition of fines under 18 U.S.C. § 3572. *Id.* § 2259A(c).

The district court adequately accounted for both in Glass's assessment. Regarding § 3553(a), it attested to "consider[ing] all" this statute's factors when sentencing Glass to prison, J.A. 1306, after which it determined the assessment. As part of this incarceration analysis, the district court specified an upward variance was warranted to reflect the seriousness of Glass's offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes. *See* 18 U.S.C. § 3553(a)(2)(A)–(C). The district court specifically emphasized how Glass violated the conditions of his pretrial and presentencing releases by acquiring several unmonitored electronic devices and accessing pornography (including CSAM) on them, indicating a high likelihood of recidivism. *See id.* § 3553(a)(2)(C). The district court also spent a lot of time discussing Glass's "history and characteristics," *id.* § 3553(a)(1), such as his age, military service, and long-running health issues. And his presentence report, which the district court adopted without change, covered Glass's personal background and sentencing

16

options in detail. *See id.* § 3553(a)(1), (3)–(4). All this suffices for purposes of § 3553(a). *See United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006) (noting district courts need not "robotically tick through § 3553(a)'s every subsection").

Section 3572 played a sufficient role too. On this score, the district court considered Glass's "income, earning capacity, and financial resources," 18 U.S.C. § 3572(a)(1), as well as "the burden that the [assessment] w[ould] impose upon" him, *id.* § 3572(a)(2). The court noted that Glass had a low capacity for future earnings, to the point of being indigent for purposes of another assessment statute. That said, the presentence report—which, again, the district court adopted in full—detailed how Glass earned upwards of $74,000 in 2021 alone. The district court thus found an assessment justified, landing on $5,000 paid in $50 monthly installments after release with the possibility of further adjustments "as warranted." J.A. 1310. Considering Glass faced a maximum assessment of $122,000 under § 2259A ($17,000 for his possession count and $35,000 for each of his receipt counts), the district court's decision strikes us as quite reasonable.

Glass boils the § 2259A analysis below into a single comment by the district court: "[Glass] could and should be able to pay some assessment with respect to [§] 2259A . . . ." J.A. 1310. To Glass's credit, many of the district court's comments cited above were made in the context of his prison sentence—not his assessment. However, "the record as a whole" still shows that "the judge 'considered the parties' arguments and ha[d] a reasoned basis for exercising his own legal decisionmaking authority'" under § 2259A. *Chavez-Meza v. United States*, 138 S. Ct. 1959, 1967 (2018) (alteration in original) (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)). In particular, much of the district court's reasoning

17

behind Glass's prison sentence applies just as well to his assessment, and the latter was determined only after the former. Though the district court expressly referred to § 2259A just once at sentencing, it had all the aforementioned § 3553(a) and § 3572 factors in mind when setting Glass's assessment. The district court did not need to repeat these points in the specific context of § 2259A; the record makes clear they were part of the equation.

## V.

Glass's claims accordingly all fall short. Though Lowrance could have added more detail about April in the affidavits, his opting otherwise did not materially alter the probable cause calculus. This means Glass failed his burden, a rigorous one by good design, to suppress the evidence seized. No more availing are his double jeopardy and § 2259A arguments, as the record undermines both. The judgment is in all respects affirmed.

*AFFIRMED*